Littleton, Judge,
delivered the opinion of the court:
Plaintiffs, millers of rice, seek to recover just compensation for rice alleged to have been taken by defendant for public use, as hereinafter set forth, during the period from September 16, 1946, through November 17, 1946. The rice in question was acquired by the defendant under War Food Order No. 10 which required rice millers to tender to or specifically set aside for defendant a certain specified percentage of all rice of certain grades milled each month. Plaintiffs had no choice in the matter. The order further provided that unless a miller had set aside the required *445 amount of rice for government use, he might not deliver any rice to his civilian customers. Violation of the order was punishable in civil and criminal proceedings.
The rice involved in these suits was set aside and delivered to the Government under such compulsory set-aside orders and was paid for at the then current OPA ceiling prices as contained in Amendment 17 to Second Revised Maximum Price Regulation 150 applicable to milled rice. This pricing order, issued September 24,1946, but effective September 16, 1946, was in the nature of an interim order intended to give the rice milling industry stopgap price relief pending issuance of a final ceiling price order pursuant to the provisions of section 6 of the Price Control Extension Act of July 25, 1946, 60 Stat. 664, 675, 50 U. S. C. App. § 906 (1946 ed.). Such final price order, known as Amendment 20 to 2nd Rev. MPR150, was issued on November 18,1946. But this price order was not made applicable to the set-aside or requisitions from September 16, 1946, through November 17, 1946.
It is plaintiffs’ contention (1) that the compulsory or mandatory set-aside and deliveries to defendant of the rice in question, pursuant to the above-mentioned set-aside orders, amounted to takings of their rice by the Government for public use, (2) that the amount paid for such rice in accordance with the ceiling prices contained in the interim price order of September 24, 1946, was less than just compensation, (8) that just compensation would have been the amount which plaintiffs would have received had the rice in question been paid for at the prices contained in the final price order of November 18,1946, and that, accordingly, plaintiffs are entitled to recover the difference, plus an additional amount measured by interest, to compensate them for the long delay in payment.
It is defendant’s position that deliveries of rice to the Government under the set-aside orders did not amount to requisitions and takings within the meaning of the Fifth Amendment to the Constitution, but were rather voluntary sales by plaintiffs. Defendant further says that if the court should hold that the rice was taken by the Government, plaintiffs received just compensation when they *446 were paid at the rates specified in the interim ceiling price order of September 24,1946.
Both of the above issues were, after careful consideration, decided favorably to plaintiffs’ contentions in Alexander Bienvenu Dore, et al. v. United States, 119 C. Cls. 560 (1951), involving identical claims of two rice milling companies.[1] A somewhat more extensive record, and one which we think is more favorable to plaintiffs, has been made in the instant cases and, for the first time, the court’s attention has been called to the fact that the two price orders in question were issued pursuant to the Price Control Extension Act of July 25, 1946, 60 Stat. 664, rather than under the Emergency Price Control Act of 1942, 56 Stat. 23, as amended. Defendant contends that the additional facts contained in the present record, and a consideration of the Price Control Extension Act of 1946, requires the court to reconsider its previous opinion and to reach a different result. Plaintiffs urge that the additional facts established in this record and a proper consideration of the 1946 Act in relation thereto, serve to strengthen and confirm the correctness of the earlier decision of the court.
There is nothing in the present record nor in the law to which defendant refers which persuades us that the set-aside orders were other than requisitions, as we specifically held in the Dore case. Defendant makes the suggestion that the court inferred a taking from the fact that neither of the plaintiffs in the Dore case made any sales to private or civilian customers during the period in suit, whereas most of the plaintiffs in the instant suit did sell some rice in excess of the requisitions to their civilian customers. Defendant also states that the court apparently relied on the fact that plaintiffs in the Dore case protested when required to deliver the rice in question, whereas some of the present plaintiffs did not.
We are of the opinion that a reading of the court’s opinion will reveal that neither the lack of civilian sales nor the presence of protests was a ground for the court’s conclusion that the mandatory deliveries amounted to takings. *447 It was the mandatory nature of the set-aside order itself, with its provisions for criminal and civil sanctions in the event of noncompliance, which persuaded the court that the so-called sales were requisitions or takings, citing Safeway Stores, Inc. v. United States, 118 C. Cls. 73, cert. den., 341 U. S. 953; Lord Manufacturing Co. v. United States, 114 C. Cls. 199, cert. den. 339 U. S. 956, rehearing denied 340 U. S. 846, and Edward P. Stahel & Co. Inc. et al., v. United States, 111 C. Cls. 682, cert. den., 336 U. S. 951.
That protests were made by Dore and International was merely a fact of record and not one on which we relied as important or controlling in concluding that deliveries to the Government under set-aside orders amounted to takings. Any such inference from the fact of protest would seem to place some sort of premium on recalcitrance when the millers really had no choice about complying. Accordingly, we adhere to our previous holding that the rice delivered to the Government pursuant to the set-aside orders was taken by the Government for public use and that the owners of the rice so taken were entitled to receive such amount as would constitute just compensation therefor.
The remaining issue is whether these plaintiffs received less than just compensation for their rice when they were paid at the OPA prices contained in the September 24, 1946 amendment to Rev. MPR 150. In the Dore and International cases the court held that milled rice taken from those plaintiffs during the same period involved herein, and at the same OPA prices, was not paid for at prices amounting to just compensation. In so holding this court recognized the principle laid down by the Supreme Court in United States v. Commodities Trading Corporation, et al., 339 U. S. 121, that ceiling prices, “fair and just to the trade generally, should be accepted as the maximum measure of compensation” unless the individual complaining of such prices can show special conditions and hardships peculiarly applicable to it. In the circumstances it was the opinion of the majority of this court that the ceiling prices contained in the interim order by OPA were neither fair and equitable to the rice milling industry generally nor to the plaintiffs individually because (1) the prices in such interim order *448 were not a reasoned determination of prices generally fair and equitable to rice millers, but were rather a guess or an arbitrary figure which OPA hoped would afford some relief to millers while OPA was considering the industry’s application for price relief,[2] (2) that the application for price relief which was under consideration during the time when the interim prices were in effect was supported by data compiled and submitted to the Government between August and October, 1946, and such data reflected market and production conditions (including costs) in existence during the time the matter was being considered and at the time the interim order was made, and that the ceiling prices contained in the final order of November 18,1946, which were conceded to be generally fair and equitable, were based on such previously submitted data, and (3) that if the prices contained in the November 18,1946, order represented the fair value of milled rice in November, they also represented the fair value of milled rice in September and October when the same market and production conditions existed as in November. The court concluded that since the interim order prices were less than fair and equitable to the industry generally during the time they were in effect, they were less than just compensation to the plaintiffs, Dore and International, who were forced to deliver their rice to the Government during that time.
In reaching its conclusion that the interim order prices for milled rice were not fair and equitable generally and did not represent just compensation, the court noted that the raw rice from which the rice taken was manufactured had been purchased by plaintiffs at government-controlled prices and milled at a cost admittedly reasonable, but that the interim prices for milled rice did not return to the millers the cost to them of the raw rice, plus the reasonable manufacturing costs.
*449 Both the Government in its briefs in the instant cases, and the dissenting opinion in the Dore and International cases, argued that the Gommodities Trading Corporation decision, supra, had eliminated from cases such as these all consideration of an owner’s cost in determining whether or not he had received just compensation in a controlled market.
We were then and are now of the opinion that the holding in the Gommodities case was not quite that all-inclusive and that it was not intended to be applied to a case involving a perishable commodity[3] where the costs relied on were not remote historical costs as was the case in Gommodities, but were actual current costs which themselves weré a prime factor in the determination by OPA in November 1946 of what that agency considered to be generally fair and equitable ceiling prices for milled rice. Another distinction between the instant cases and the Gommodities case, not discussed in the Dore and International opinion of this court, is the fact that the ceiling price for pepper was established under the Emergency Price Control Act of 1942, as amended, and pertinent regulations thereunder, whereas the interim prices and final prices for milled rice in the instant cases were established after that Act had expired on June 30,1946, and the Price Control Extension Act of July 25, 1946, had been enacted, which latter Act contained somewhat different criteria and was intended to accomplish a different purpose than the wartime Act.
In order to understand the differences which we think existed between the situation in these cases and those before the court in the Gommodities case, and also the significance of the interim prices for milled rice herein, we think it would be helpful to review the facts of record, some of which were not called to the attention of the court in the Dore and International cases.
All plaintiffs herein were rice millers whose business involved the buying of raw rice from the growers, processing it to remove the hull from the kernel, milling and polishing the kernel, separating and grading the broken kernels into *450 various categories or grades, placing it in containers, and distributing it for sale in trade channels. The unit of sale of milled rice in bulk is 100 pounds (a pocket of rice). Eice is grown and milled in the southern States of Louisiana, Texas and Arkansas, and also in California. All plaintiffs herein were southern States millers except plaintiff William P. Crawford who, doing business as Woodland Eice Company, operated his business in Woodland, California. Eice was grown in California under conditions different from those in the South, and the milling seasons, operating costs and competitive markets were different from those of the southern rice milling industry.
Pursuant to the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, milled rice came under price control in the spring of 1942. (Finding 5.) On June 1, 1942, Maximum Price Eegulation 150 rolled back the prices of milled rice to the approximate level of prices which had existed during the period from mid-December 1941 to mid-March 1942, and, on August 19,1942, a further rollback of approximately 10 percent took place.
On January 21, 1943, the Secretary of Agriculture, pursuant to authority given him by Executive Order 9280 (3 C. F. E. Cum. Supp. 1938-1943, inclusive, 1234), issued Food Distribution Order No. 10, sometimes known as the set-aside order. The original order required millers to set aside for delivery and sale to governmental agencies sixty percent of all milled rice of certain grades and classes, at no more than ceiling prices established by the Office of Price Administration. Details of the order were changed from time to time by amendments.' (Finding 7.) On September 17, 1946, Amendment 18 to WFO No. 10 provided that beginning September 1, 1946, millers must set aside in each calendar month for sale and delivery to the Government milled rice of one or more of the grades 1 to 6, classes I to XII, in an amount equal to 40 percent of the total combined quantity of brown and milled rice milled by the millers during such month.
Until the above set-aside requirements were met, millers could not deliver milled rice into civilian channels. Further details of the order are set forth in finding 7. Anyone vio *451 lating the order was subject to being prohibited from receiving, making any deliveries of, or using rice. Willful violators of the order were declared to be guilty of a crime and liable to prosecution under all applicable laws. The order also provided that civil action might be instituted to enforce any liability or duty created by, or to enjoin any violation of any provisions of, the order.
Changes in the rate of set-asides in the various amendments to WFO No. 10 were made on the basis of changes in estimates of the quantities of rice needed by the Government, and also of the estimated production of rice for the coming season. The 40 percent set-aside applicable to the 1946 milling season (Amendment 18, above) was arrived at by the Government after receipt of crop estimates based on the harvest of rough rice which had commenced. In States served by the southern rice milling industry, the harvest season of rough rice lasts about three or four months, and in 1946, rough rice started to come into the mills in August, with the heaviest movement in September and October 1946.
Although milled rice came -under price control in the spring of 1942, it was not until 1944 that price control was applied to rough or raw rice, which was the basic raw material used by the millers in producing milled rice. On March 7, 1944, Maximum Price Regulation 518 was issued establishing maximum prices for the sale of rough rice.
Although the maximum prices for milled rice remained the same from 1942 to September 24, 1946, amendments to MPR 150 (milled rice) between August 19, 1942, and September 24, 1946, and to MPR 518 (rough rice), had the actual effect of lowering the prices which millers received for their product. Amendments to MPR 150, which brought about this result, were amendments which (1) prohibited the addition of freight from the base point to the milling point, (2) removed brown and undermilled rice from the price category of finished rice, (3) reduced the ceiling price of brown and undermilled rice, and (4) disallowed the primary distributor’s margins, thus reducing the miller’s markup. Furthermore, on October 15, 1944, MPR 518 (rough rice) was amended to increase the price of rough rice which the millers had to purchase to produce milled rice, and on June *452 26, 1946, amendments to MPR 518 imposed the costs of inspections of rough rice on the millers and increased the cost of all rough rice by about 60 cents per barrel. (Finding 9.)
On June 30, 1946, the provisions of the Emergency Price Control Act of 1942, as amended, were terminated in accordance with section 1 (b) thereof, as amended. On July 25, 1946, the President approved the Price Control Extension Act of 1946. The objectives of the new legislation were set forth in Section 1A as follows:
(al objectives. — The Congress hereby affirms—
(1) that because of abnormally excess spending power in relation to the presently available supply of commodities, rapid attainment of production equal to the public demand is one of the necessary and urgent objectives for the prevention of inflation and for the achievement of a reasonable stability in the general level of prices and rents, cost of living and costs of production (including labor costs), for the purposes set forth in section 1 of this Act and for the further purposes of protecting the real value of benefits provided by law for veterans and their dependents, of keeping faith with purchasers of United States War Bonds, and of making possible a successful transition to a peacetime economy of maximum employment, production, and purchasing power under a system of free enterprise;
(2) that unnecessary or unduly prolonged controls over prices and rents and use of subsidies would be inconsistent with the return to such a peacetime economy and would tend to repress and prevent the attainment of this and the other goods herein declared; and
(3) that adequate prices are necessary stimulants to the production thus desired and the expeditious attainment of said goals.
Section 1A (b), (c) and (d) contained provisions for early decontrol. Subparagraph (e) covered the treatment of agricultural commodities including rice, in the transition period, and provided in pertinent part, as follows:
(1) On the first day of the first calendar month which begins more than thirty days after the date of enactment of this section [September 1, 1946], the Secretary of Agriculture shall certify to the Price Administrator each agricultural commodity which such Secretary determines to be in short supply. Thereafter, on -the first day of each succeeding calendar month the Secretary *453 shall certify modifications of such certification by adding other agricultural commodities which have become in short supply and by removing from such certification such commodities which he determines are no longer in short supply. No maximum price shall be applicable with respect to any agricultural commodity during any calendar month which begins more than thirty days after the date of enactment of this section, unless such commodity is certified to the Price Administrator under this paragraph as being in short supply.
(2) (A) Whenever the Secretary of Agriculture determines that maximum prices applicable to any agricultural commodity which is in short supply are impeding the necessary production of such commodity, he may recommend to the Price Administrator such adjustments in such maximum prices as the Secretary determines to be necessary to attain the necessary production of such commodity.
# # * * * * #
(C) Within ten days after the receipt of any recommendation under this subsection for the adjustment of maximum prices applicable to any agricultural commodity * * * the Price Administrator shall adjust * * * such maximum prices in accordance with such recommendations.
* * * * * * *
The last quoted provision apparently applied only to farmers’ produce, in this case, rough rice.
Section 11 of the Price Control Extension Act of July 25, 1946, also amended the Emergency Price Control Act of 1942 by adding a new section changing the base period and providing for the establishment of adequate price levels in the transition period on the basis of new standards, in pertinent part as follows:
* * * (a) For the purposes of this section the base period shall be the calendar year 1940, or in the case of an industry customarily keeping its accounts on a fiscal year basis, the industry’s fiscal year 1940.
(b) In order that adequate general price levels shall be established for all commodities to bring about maximum production and employment, no maximum prices shall be established or maintained for any product of a producing, manufacturing, or processing industry * * * which do not return on the average to the industry not less than the average dollar price of such product during the base period, plus the average increase in cost of pro- *454 clucing, manufacturing, or processing the same accruing since the base period, but the maximum prices for a product shall be deemed in compliance with this standard if such prices on the average are equal to the average current total cost of the product plus the industry's average overall profit margin on sales in the base period.
(c) For the purpose of determining costs under this section, currently or for the base period, the Administrator shall ascertain the costs of a reasonable number of typical producers, manufacturers, or processors and shall follow accepted methods of accounting and such fair and reasonable methods of calculation as he shall establish by regulation, including adjustments for temporary cost abnormalities which may be reasonably anticipated to be eliminated within the three months following the Administrator’s determination, and adjustments for increases in the volume of production which may be reasonably anticipated to be experienced within such three-month period.
(d) Maximum prices established hereunder shall not be held invalid on account of their failure to return his costs to any particular member of any group involved.
* $ $ $ ■a
(f) .If the maximum prices of a product on the average equal its average current total cost plus a reasonable profit, nothing herein shall require any further adjustment of such maximum prices for any period with respect to which it appears that a substantial expansion in the production or use of the product would not be practicable or would be practicable only by reducing the production of at least equally needed products. *****
(i) Nothing in this section shall be construed to require any adjustment in maximum prices except pursuant to an application filed under this paragraph, or be construed to invalidate any maximum price un less there is a failure to make adjustments, in accordance with the procedure prescribed in this paragraph, to such extent as may be required to comply with the standards set forth in this section. Any industry advisory committee may apply to the Administrator for the adjustment of the maximum prices applicable to any product in accordance with the standards set forth in this section, and shall present with the application comprehensive evidence with respect to costs and prices. * * *[4] [Italics supplied.]
*455 Following enactment of the Price Control Extension Act of 1946, on July 25, 1946, the chairman of the Nice Milling Advisory Committee[5] called a meeting of the committee on August 14,1946, to be held at the offices of OPA, with representatives of that agency attending, to discuss, among other things, the ceiling prices for milled rice in relation to the prices for rough rice. The committee advised OPA officials that the existing ceiling prices for milled rice did not allow millers a generally fair and equitable margin and, on the second day of the meeting (August 15, 1946) the committee filed with OPA a formal written application for an increase in the prices of milled rice. OPA officials advised the committee that a new procedural regulation was then being prepared by OPA which would prescribe the data which OPA would require in order to consider an application for price increases under the new Price Control Extension Act of 1946; that any application would have to conform to such regulation, but that no information was then available as to what the requirements of the regulation would be. OPA officials at the meeting thought that it would be possible to send OPA accountants and other officials to New Orleans within about 10 days to advise the industry committee concerning the data that would be required in an application under the new procedural regulation. Such was not the case, however, and it was not until September 10, 1946, that the information was available, and not until September 17, 1946, that the regulation (No. 188) was actually issued. Immediately following the August 14 and 15 meetings of the Industry Advisory Committee with OPA, that committee contacted its membership advising that comprehensive evidence with respect to costs and prices would be required to support an application for increased ceiling prices under the new law, and urging the members to begin compiling such information and evidence for submission at the New Orleans meeting with OPA. It was pointed out that the *456 so-called Barkley Amendment required that maximum prices should return on the average to the industry not less than the average dollar price of a product during the base period specified in the new law, plus the average increase in cost of processing the product accruing since the base period. It was also noted that OPA would require current cost and price data from not less than 25 milling firms. The accounting firm of Haskins & Sells was retained to compile the cost and price data furnished by the milling firms.
On September 1,1946, in accordance with Section 1A (e) of the Price Control Extension Act of 1946 (finding 10), the Acting Secretary of Agriculture certified that rice was in short supply.
On September 6, 1946, the Acting Secretary of Agriculture certified that continuation of the existing maximum prices applicable to rough rice and milled rice on June 80, 1946, would impede the necessary production of rice and that an adjustment in the prices of milled and rough rice was necessary to obtain such production. That official then recommended to the Price Administrator that the maximum price for rough rice be increased $1.00 per barrel and that the maximum price for finished rice “be adjusted to reflect this increase of $1.00 per barrel in the cost of rough rice.” (Finding 17.) On September 17,1946, OPA issued Amendment 13 to MPE 518 increasing the price of rough rice by $1.00 per barrel as recommended by the Secretary of Agriculture. On that same day Eegulation 188 prescribing the details of the comprehensive price and cost data which OPA would require in the application for milled rice price increases was finally issued.
Eeliable information concerning the contents of the above procedural regulation had been made available to the Eice Milling Advisory Committee at a meeting in New Orleans on September 10, 1946. At that same meeting, the OPA economist present recommended that in view of the fact that the rice milling industry generally was in a loss position and was not recovering total costs under the existing ceiling prices for milled rice, an interim price increase for milled rice should be granted to relieve in some measure the economic squeeze in which the milling industry found itself. *457 Everyone concerned apparently knew that the price of rough rice was about to be increased substantially in accordance with the recommendation of the Acting Secretary of Agriculture, and that it would be some time before OPA would be able to analyze and act on the comprehensive cost and price data which the new regulation would require to support the millers’ application for price increases for milled rice-
As noted above, the increase in the ceiling price of rough rice was made effective September 17, 1946. On September 24,1946, while the Rice Milling Industry Committee was assembling the data required by the September 17,1946 procedural regulation to support the application for price increases for milled rice, OPA issued an interim order increasing the price of milled rice by 50 cents per barrel. The Statement of Considerations which accompanied this order (known as Amendment 17 to Second Revised Maximum Price Regulation 150) noted the following circumstances: (1) that pursuant to the direction of the Secretary of Agriculture, the price of rough rice had just been increased by $1.00 per barrel; (2) that the Secretary of Agriculture had directed the Price Administrator to adjust the maximum prices for finished or milled rice to reflect such increase in the cost of rough rice; (3) that in addition to the increased cost placed on millers by virtue of the increase in the price of rough rice, millers were just about to experience the impact of two other increases in their production costs (a) due to Amendment 11 to MPR 518 of July 25, 1946, establishing premiums of 2 cents per barrel for each one-tenth of one percent of moisture content below 17 percent down to 14 percent, thus requiring millers to pay additional amounts for their rough rice, and (b) a new requirement that millers bear the expense of the official certification and determination of moisture content made by the U. S. Department of Agriculture; (4) that on the basis of a 1944 accounting survey conducted by OPA and from other information available to OPA, rice millers were not (in September, 1946) recovering their total costs. The Statement of Considerations concluded that the Price Administrator was of the opinion that an interim adjustment in current maximum prices of milled rice was appropriate in order “to cover *458 these two known material costs increases”, i. e., the increase in the price of rough rice and the expenses relative to moisture content in rough rice which millers were required to bear since July 25, 1946. It was also stated in the order that the 50 cent increase would “generally cover total costs for the product.” The final paragraph of the statement noted that the Eice Milling Industry Advisory Committee was at that time preparing a petition for adjustment of its maximum prices for milled rice under section 6 of the Emergency Price Control Act of 1942, as amended by the Price Control Extension Act of 1946; that the Price Administrator realized that a considerable time might elapse before the petition for relief was finally prepared and a decision reached thereon by OPA. The statement concluded by stating that the information received as a result of the application of the Industry Committee would enable the Price Administrator to determine the extent of any further adjustment that might be necessary in the price of milled rice. At this point we note that the amendment to section 6 of the 1942 act required that maximum prices established under such amendment should be equal to the average current total cost of the product plus the industry’s average overall profit margin on sales in the new base period. The interim increase purported to cover only the then Imown costs of the milled rice.
On October 16, 1946, the Eice Milling Industry Advisory Committee submitted to OPA the comprehensive data required by Eegulation 183 to support its application for maximum price increases on milled rice under section 6 of the 1942 Act, as amended by the Price Control Extension Act of 1946. On November 18, 1946, OPA issued Amendment 20 to Second Eevised Maximum Price Eegulation 150 in response to the petition of the Eice Milling Advisory Committee. This price order increased the prices for all varieties of milled rice by $0.704 per barrel of rough rice milled and represented favorable action on all requests of the Advisory Committee except for certain future costs which were disallowed.
The Statement of Considerations setting forth the basis for the adjustment in maximum prices of milled rice noted that while the Eice Milling Industry Advisory Committee *459 was preparing its petition for adjustment in maximum prices for milled rice under the new price law, OPA had given certain interim price relief in order to assure that the industry would generally cover total costs:
The adjustment above referred to was made to give a certain amount of relief to the industry in the interval before a final adjustment could be made. [Finding 26.] [Italics supplied.]
The statement then noted that the data accompanying the application of the industry satisfied all the requirements of Supplemental [procedural] Order 183; that such data had been carefully considered by the Food Accounting Branch and the Rice Section of the Food Price Division; that the amount of increase applied for was $0.71198 and included a factor of $0.166 per barrel of rough rice to cover certain cost increases such as repairs, brokerage, packaging materials and property taxes; that OPA had decided to disallow that part of the cost increase due to brokerage and property taxes and grant the other items making a total increase allowed of $0.704 per barrel of rough rice milled. The Statement of Considerations declared that the increase so granted was in compliance with the requirements of the amended section 6 of the Emergency Price Control Act of 1942 (section 11 of the Price Control Extension Act of 1946) and that the maximum prices established in the order were “generally fair and equitable” and in compliance with existing price control law and applicable regulations.
On December 23,1946, the Rice Milling Industry Advisory Committee wrote to the Temporary Controls Administrator, who had succeeded to the duties of the Price Administrator, asking that the price increase, provided for on November 18, 1946, be made retroactive either to July 25,1946, the effective date of the Price Control Extension Act, or to August 16, 1946, the date on which the Industry Advisory Committee filed the first application for maximum price increases under the 1946 amendment to section 6 of the Price Control Act. The letter pointed out that the committee had attempted with all diligence to avail itself of the benefits of the new pricing standards set forth in the amendment to section 6 by filing its application on August 16,1946, but that no consideration *460 was then given the application by OPA for the reason that it did not comply with certain requirements which were expected to be included in a proposed procedural regulation not yet issued by OPA. The letter also pointed out that following the issuance of the procedural regulation on September 17, 1946, additional time was required by the Committee to fulfill the very complex and involved requirements of the regulation, which in the opinion of the committee far exceeded any requirements indicated in the amendment to section 6 of the Price Control Act. The committee noted that its application complying with the procedural regulation was completed and filed on October 16, 1946, but that further delay in reaching a final decision thereon by OPA was caused by the action of OPA in permitting, on November 6, 1946, certain California rice mills to join the proceedings filed by and on behalf of the southern rice industry, despite the fact that on August 16,1946, OPA officials present at the meeting with the industry commitee on that date had stated that the southern rice industry and the California group would be dealt with separately.[6] Urging that the long delay in granting the price increases warranted by the new pricing standards contained in the 1946 Act was due entirely to the manner in which OPA had handled the industry’s application and the issuance of the procedural regulation, the committee stated that it believed the effective date of the increase finally allowed should be made retroactive to some earlier date.
No action was ever taken by OPA or its successor agencies upon the above request of the Eice Milling Industry Advisory Committee.
Following the time the rice millers were required to pay $1.00 per barrel more for rough rice (September 17, 1946, finding 22), efforts were made by the mills to limit sales of milled rice to their private customers until the requested increase in the maximum ceiling price of milled rice was granted by OPA. Most of the plaintiffs herein made some sales of milled rice in bulk quantities to domestic private *461 purchasers from September 16, 1946 through November 17, 1946, on a restricted and rationed basis for the purpose of retaining the good will of valued customers and to protect their brand names in the consumers market. Beaumont Eice Mills was able to suspend all private sales during that period except for 1,000 pockets of brewers rice.
On September 20, 1946, acting under WFO-10, the set-aside order, the Department of Agriculture issued announcements Gr-69 and Gr-75 relative to required sales and shipments of milled rice to the Commodity Credit Corporation during the 1946-1947 milling season. (Findings 31, 32 and 33.) The announcements provided that the price to be paid for milled rice delivered thereunder should not exceed the price set forth in OPA 2nd Eevised Maximum Price Eegulation 150 in effect at the time of delivery. As indicated earlier herein, compliance with the set-aside and delivery requirements was mandatory and enforceable in civil and criminal proceedings. The findings applicable to the individual plaintiffs indicate the amounts of rice delivered to the Government pursuant to WFO-10 and the above announcements during the period in question, and the prices paid for such milled rice on the basis of the maximum prices contained in the September 24,1946, interim price order.
At the same time as the above events were taking place, the Administrator of WFO-10 was insisting that all mills which had not set aside and delivered to the Government the required amount of milled rice for the milling season of the previous year, should make up such deficits or face civil or ¡criminal prosecution.. Most of the millers wrote to the Administrator and asked to be relieved of the necessity of making up the past year’s set-aside deficit from the current crop. They explained that various adverse conditions, including high moisture content of rice, had made it impossible for them to comply fully with set-aside requirements during the past season. Although it was within the power of the Administrator to grant the relief requested, he apparently made no investigation of the conditions which the millers alleged had prevented their fulfilling the complete set-aside requirements, and, without commenting in any way on their requests for relief, he advised them in a form letter that *462 failure to make up the entire deficit from the current crop would subject them to civil and criminal prosecutions. (Findings 34, 35, and 36.) Some of the plaintiffs herein were so prosecuted, as will appear from the findings applicable to the individual plaintiffs.
Although the same ceiling prices applied to sales of milled rice to the Government and to the civilian trade, sales of milled rice to the Government involved greater expense to the millers for the following reasons: the Government required the use of more expensive bags which had to be individually marked by hand labor; certificates of quality had to be furnished; the rice had to be physically set aside and held, awaiting shipping instructions from the Government ; from 6 to more than 30 days might elapse before the Government made payment, thus increasing the mill’s financing and interest expense. In general, these items of expense were not present in non-Government sales. In addition, OPA ceiling prices on milled rice at the times herein pertinent permitted rice millers a markup for export of 4 percent and a markup for milled rice packed in consumer-sized packages, neither of which was applicable to rice sold in bulk, as was all rice sold to the Government in these cases.
The maximum price increase granted in the final order of OPA on November 18, 1946, was arrived at pursuant to new pricing standards contained in the Price Control Extension Act of 1946. Section 11 of that act which amended section 6 of the Emergency Price Control Act of 1942, provided for a new base period, i. e., the calendar year 1940, or the industry’s fiscal year 1940. Another new standard provided in this section was that maximum prices established under the new law should return to the industry in question not less than the average dollar price of the product involved, during the new 1940 base period, plus the average increase in the cost of producing, manufacturing, or processing the product accruing since the new base period. The new section also provided that maximum prices for a product should be deemed in compliance with the new standards if such prices on the average were equal to the average current total cost of the product plus the industry’s average over-all profit margin on sales in the new base period. During the *463 industry’s 1940 fiscal year, a reasonable operating spread for the rice milling industry as a whole, between the cost of rough rice and the selling price of milled rice, was from $1.59 to $1.60 per barrel of rough rice. This spread included a profit of a little more than 26 cents per barrel of rough rice.
The price increase permitted by the interim order of September 24, 1946, effective September 16, 1946, did not purport to establish a ceiling price for milled rice which was in compliance with section 11 of the Price Control Extension Act of 1946 amending section 6 of the 1942 Act. As the Statement of Considerations accompanying the interim order states, such price increase was only intended to give relief to take care of two known cost increases pending study of cost data being supplied by the industry to support its then pending application for price adjustment in accordance with the new standards contained in the 1946 act. The interim order in these cases did not take into consideration the spread the industry had had in the new base period, fiscal year 1940, between the selling price of milled rice and the cost of rough rice, nor did the interim increase enable the rice milling industry generally to recover its total costs, to say nothing of the industry’s average over-all profit margin on sales in the base period.
The prices for milled rice fixed as a result of the final OPA order of November 18, 1946, were, insofar as this record indicates, established strictly in compliance with the new provisions of the amended section 6 of the Price Control Act, referred to above, and there is no contention that they were not what they purported to be and in fact were, i. e., fair and equitable to the rice milling industry generally. In view of the fact that such prices were based also on the average current total costs of the industry, that is, costs in existence during the periods involved in this suit, such prices were fair and equitable to the industry generally during all of that period, whereas the prices contained in the interim order, of necessity, were not.
We revert at this point to our earlier discussion of the holding of the Supreme Court in the Gommodities Trading Corporation case in which the Supreme Court held that on the record before the Court of Claims the ceiling price for *464 whole pepper was generally fair and equitable and was, therefore, just compensation to the owners of the pepper at the time and place of taking regardless of the fact that such price did not return to the plaintiff in that case its original cost of purchasing the p'epper plus storage and handling costs over a period of years prior to the takings. We think that this holding was not intended to be any broader than the facts of that particular case warranted, and that it does not stand for the proposition that in a controlled market an industry’s costs or a claimant’s costs have no bearing whatsoever on the determination of whether just compensation has been received for a product taken and paid for at the controlled price. Earlier in its opinion the Supreme Court made the following pertinent observation at page 123:
This Court has never attempted to prescribe a rigid rule for determining what is “just compensation” under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards.
In the Commodities case the product taken was a nonperishable commodity, i. e., whole black pepper, which had been purchased by the plaintiff during the early depression years as an investment. When ceiling prices were imposed upon the commodity, they represented the then current market price of whole black pepper although even at that time much of plaintiff’s pepper had cost plaintiff more than such ceiling price; but this was only because of accumulated storage and handling charges over a long period of years. Probably because plaintiff had no intention of selling its pepper which, as noted above, had been purchased as a long-term investment, only one attempt was made in 1943 to persuade the Price Administrator to increase the ceiling prices for pepper by allowances for storage charges. Upon denial of this petition, no further action in the Emergency Court of Appeals was ever taken.
In holding that the plaintiff had not received just compensation for the pepper taken when it was paid at the ceiling *465 prices, the Court of Claims took into consideration an element of value known as retention value, or the right to hold its property for a higher price at some later date, but for the compulsion to deliver to the Government, and also took into consideration the remote original cost of the pepper, including the storage and handling costs over a number of years. In reversing the Court of Claims, the Supreme Court rejected both factors as valid elements in determining just compensation in a controlled market and noted that the plaintiff had offered no other factors which rebutted the presumption that the OPA ceiling price, required by the Price Control Act to be fair and equitable to an industry generally, was in fact just compensation.
In the instant case the commodity taken was a perishable commodity customarily grown, harvested, sold in its raw state to millers who processed it by milling, and disposed of it in each year in which it was grown. At the time the milled rice was taken, the applicable price control legislation was not the act in effect at the time of the taking of Commodities' pepper, but was new legislation designed to meet the problems of the transition period following the end of World War II. That portion of the new legislation applicable to milled rice provided that no maximum price would be deemed fair and equitable to the industry concerned generally unless it returned to the industry not less than the average dollar price of the product during the new base period prescribed by the act (1940 calendar or 1940 fiscal year), plus the average increase in cost of producing, manufacturing or processing the product accruing since the base period, but that the maximum prices for the product would be deemed in compliance with that standard if such prices on the average were equal to the average current total cost of the product plus the industry's average over-all profit margin on sales in the "base period. This legislation was a clear mandate to OPA to consider current costs and average over-all profit margins in a specified base period in fixing ceiling prices on a generally fair and equitable basis. The new legislation also provided that such determination should be made on the basis of industry applications for price adjustments under the new standards supported by comprehensive data relative *466 to costs and prices. Such an application was submitted by the Nice Milling Industry Advisory Committee in August of 1946 but OPA, considering it necessary to first issue a detailed regulation relative to what it wished in the way of comprehensive cost and price data, postponed consideration of the application until it had issued such a regulation and the industry committee had complied with it.[7] However, on the basis of what OPA officials already knew concerning industry costs, it was recognized that the maximum prices for milled rice established under the old price control law (which had expired on June 30,1946) were inadequate even to cover Imown costs without any consideration of possible and probable other current costs and the margin of profit on sales in the newly established base period of 1940, all of which additional information would be made available to OPA once the procedural regulation was issued and the industry had had an opportunity to assemble the required cost and price data. Accordingly, on September 24,1946, OPA issued the interim price order granting an increase in the old ceiling prices of 50 cents per barrel of rough rice. Such increase was not intended to represent an official OPA determination of a ceiling price fair and equitable to the rice milling industry generally on the basis of current costs and the 1940 margin of profit, because OPA knew and stated that it could not make such a determination until it had considered the comprehensive cost and price data submitted to it by the industry. While it is true that the interim price order was an official price order, the circumstances surrounding its issuance rebut the presumption that it was either fair and equitable generally to the rice milling industry, or was just compensation for rice taken while such pricing order was in effect. OPA *467 itself never indulged in such a presumption and nothing in the record of these cases warrants this court’s doing so.
At the time the rice in question was taken by the Government, i. e., from September 16,1946, through November 17, 1946, the interim maximum price paid for such rice was not fair and equitable to the rice milling industry generally, nor was it just compensation to the plaintiffs herein. On the contrary, the prices established in the final order of November 18, 1946, in accordance with the standards prescribed by the Price Control Extension Act of 1946, were fair and equitable to the rice milling industry generally, not only at the time of the issuance of the order, but during the entire period of some two months during which the interim order was in effect. The price established in November for future sales was based upon data compiled and submitted by the industry and these plaintiffs covering current costs and prices in August, September, and October, 1946, including the price increase in raw rice, and in establishing such price in November OPA considered the market conditions under which the very rice involved in this suit had been produced. The fair value of the rice taken from these plaintiffs between September 16, 1946, and November 17, 1946, milled under virtually identical conditions as existed on November 18,1946, must have been the same as its fair value on November 18,1946.
That some of these plaintiffs, unlike Dore Rice Mills and International Rice Milling Company, Inc., made limited sales to private customers during the period involved in this suit, does not, in our opinion, have any bearing on the question of whether the interim price paid by the Government and admittedly paid by the private customers, amounts to just compensation in the constitutional sense. It is obvious from the record that the bulk sales to private customers were made for compelling business reasons and it is shown that they resulted in a loss to the millers. While the millers could limit their sales to their private customers and thus cut their losses pending action on their application for price adjustment, they could not in any way limit their deliveries and sales to the Government, and for the privilege of compelling delivery of private property for public use, the Gov- *468 eminent has consented and obligated itself to pay just compensation. Inasmuch as it appears that the November 18, 1946, maximum prices for milled rice were fair and equitable to the industry generally, not only on that date but for the period in suit, it follows that these plaintiffs did not receive just compensation for their rice when they were paid at the lower interim price during September and October, and up to November 18,1946. Accordingly, plaintiffs herein are entitled to recover the difference between the amounts paid for such rice at the interim price scale and what they would have been paid had the final price order been applied to such sales, and judgments in those amounts will be entered for each plaintiff herein, together with an additional amount measured by interest at 4 percent from the respective dates of taking until paid, not as interest but as a part of just compensation, as set forth in the conclusion of law following the findings of fact herein.
LaraMORE, Judge, and Whitaker, Judge, concur.
Madden, Judge, dissents.
Jones, Chief Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes the following findings of fact:
1. By these cases, all except one of which were consolidated for trial by stipulation of 'counsel, the plaintiffs seek to recover what they claim is just compensation for milled rice delivered to the defendant under set-aside orders of the War Food Administrator during the period September 16, 1946, through November 17,1946. The plaintiffs were in each case paid for rice delivered at an OPA interim price, and they claim the difference between that price and the price which OPA fixed at a higher level, effective November 18,1946.
The one case, Crawford, No. 473-52, which was not consolidated for trial because of the location of plaintiff’s witnesses on the West Coast, is reported here because it presents similar matters for determination.
*469 2. (a) Plaintiff, The Arkansas Rice Growers Cooperative Association, is an Arkansas corporation with a mill and its principal office in Stuttgart, Arkansas, and also with an office and milling facilities at DeWitt, Arkansas.
(b) Plaintiffs, John M. Chumney and Robert L. Williams, are a partnership trading as Gulf Coast Rice Mills with their principal place of business at Houston, Texas.
(c) Plaintiff, El Campo Rice Milling Company, Inc., is a Texas corporation with its principal place of business at El Campo, Texas.
(d) Plaintiff, Kaplan Rice Mill, Inc., is a Louisiana corporation with its principal place of business at Kaplan, Louisiana.
(e) Plaintiff, Lake Rice Mill, Inc., is a Louisiana corporation which was organized on or about July 1,1949. On July 26, 1949, it purchased all of the assets, including accounts receivable, from Lake Rice Mill, a partnership consisting of Maple Hughes and Julius Boutte. The corporation assumed, as part of the consideration of the sale, certain liability for accounts payable, notes payable and mortgages of the partnership. Maple Hughes became a stockholder of the corporation, but there is no evidence in the record that Julius Boutte is or was a stockholder.
(f) Plaintiff, William M. Loving, is an individual trading under the name Loving Rice Mills, and has his principal place of business at Crowley, Louisiana. In 1950, Mr. Loving transferred the assets of his business, except this claim, to a corporation, Loving Rice Mills, Inc., of which he owns 98 percent of the stock.
(g) Plaintiff, Mermentau Rice Mill Company, Inc., is a Louisiana corporation with its principal place of business at Mermentau, Louisiana.
(h) Plaintiff, Mouton Rice Milling Company, is a Delaware corporation with its principal office and place of business at Harrisburg, Arkansas.
(i) Plaintiff, National Rice Mills, Inc., is a Louisiana corporation with its principal place of business at New Orleans, Louisiana.
*470 (j) Plaintiff, Pritchard Eice Milling Company, Inc., is a Texas corporation with its principal place of business at Houston, Texas.
(k) Plaintiff, Producers Eice Mill, Inc., is an Arkansas corporation with its principal place of business at Stuttgart, Arkansas.
(l) Plaintiff, Eiver Brand Eice Mills, Inc., is a Delaware corporation with its main office and principal place of business at Houston, Texas.
(m) Plaintiffs, Eugene P. Sabatier and George Sabatier, are a partnership doing business as The Superior Eice Mill Company, with their principal place of business at Eunice, Louisiana.
(n) The Smith Eice Mill Company was an Arkansas corporation with its principal place of business at DeWitt, Arkansas. On September 1,1948, it filed with the secretary of state of the State of Arkansas, a certificate of dissolution. This action was taken pursuant to a formal resolution adopted by the stockholders at a special meeting of the stockholders held on August 13, 1948. Plaintiffs, George Smith, John A. Smith, C. P. Cheney, Otto Leibrock, and Mrs. J. A. Smith were named trustees of Smith Eice Mill Company in liquidation and any funds received by the trustees on this claim will be distributed to the stockholders of the corporation in proportion to their stock ownership.
(o) Imperial Eice Milling Company, Inc., was a Louisiana corporation with its principal office at Crowley, Louisiana. At a stockholders’ meeting held on May 31, 1948, a sale of its physical properties was authorized and a resolution was adopted that the corporation be dissolved, and that Wayne Thomson be appointed liquidator to wind up the affairs of the corporation. On a certificate of the liquidator that the affairs of the corporation had been completely wound up and dissolved, the secretary of state of the State of Louisiana issued a certificate of dissolution on September 1, 1948. Under the laws of the State of Louisiana the liquidator, Wayne Thomson, is the proper person to maintain this action for the benefit of the persons who would have been entitled thereto if the assets had been realized before the dissolution of the corporation.
*471 (p) Plaintiff, Tyrrell Rice Milling Company, is a Texas corporation with, its principal place of business at Beaumont, Texas.
(q) Plaintiff, United Rice Milling Products Co., Inc., is a Louisiana corporation with its principal place of business at New Orleans, Louisiana.
(r) At the time of transactions which are the subject of this claim, Roberts Rice Milling Company, with its principal office at Crowley, Louisiana, was a partnership composed of the following, each having an undivided interest in the amount shown:
Cecil O. Wofford, one-third;
William D. Roberts, Jr., one-sixth;
Millard D. Roberts, one-sixth;
James H. Gulledge, one-sixth;
Ruth A. Stratton, one-twelfth; and
Louise S. Norvell, one-twelfth.
By June 1948, because of the purchase of the interests of James H. Gulledge, Ruth A. Stratton, and Louise S. Norvell, the Roberts Rice Milling Company became a partnership composed of the following, each having an undivided interest in the amount shown:
Cecil O. Wofford, one-half;
Millard D. Roberts, one-fourth; and
William D. Roberts, Jr., one-fourth.
Martha P. Gulledge joins herein as a plaintiff as the duly qualified executrix of the estate of James H. Gulledge, deceased. Henry T. Stratton joins herein as a plaintiff as the duly qualified executor of the estate of Ruth A. Stratton, deceased.
(s) Adolphus Rice Milling Company was a Texas corporation. In the latter part of 1947, Robert B. Holland acquired all of its capital stock. Upon surrender and cancellation of such stock, Adolphus Rice Milling Company transferred to him on December 31, 1947, all real property and improvements, cash, securities, notes, accounts receivable, merchandise and inventories, supplies and equipment, claims and causes of action and all property and assets owned by that firm.
*472 On the next day, January 1,1948, Holland sold all of the above-described tangible and intangible property to Orange Rice Milling Company except cash on hand and real and personal property situated in Waller County, Texas. The Orange Rice Milling Company was a Texas corporation and on January 1, 1948, Robert B. Holland owned all of the stock of this corporation. The property conveyed to Orange Rice Milling Company was conveyed subject to the liens of two deeds of trust which had been given to secure payment of an unpaid balance on two notes. On February 12,1948, Orange Rice Milling Company formally changed its name to Adolphus Rice Mills, Inc. On April 6, 1951, Adolphus Rice Mills, Inc., formally changed its name to Wonder Rice Mills, Inc.
(t) Plaintiff, Wonder Rice Mills, Inc. (Ark.), is an Arkansas corporation with its principal place of business at Stuttgart, Arkansas. It had operated under the name Walton Rice Mill, Inc., until May 1951, when its name was formally changed.
(u) Plaintiff, Beaumont Rice Mills, is a Texas corporation with its principal place of business at Beaumont, Texas.
(v) Plaintiff, Edmundson-Duhe Rice Mill Company, Inc., was in 1946 a Louisiana corporation with its principal place of business at Rayne, Louisiana. The corporation was dissolved early in 1958, and Lawrence H. Breaux was appointed liquidator, but as of April 1954, no distribution had been made of the present claim.
(w) Plaintiff, Louisiana State Rice Milling Company, Inc., is a Louisiana corporation with its principal office at Abbeville, Louisiana, and with mills at five locations in the State of Louisiana and two locations in Arkansas.
(x) Plaintiff, Republic Rice Mill, Inc., is a Louisiana corporation with its principal place of business at Gueydan, Louisiana.
(y) Plaintiff, American Rice Growers Cooperative Association, is a cooperative association organized under the laws of the State of Louisiana with its main office at Lake Charles, Louisiana.
(z) Plaintiff, William P. Crawford, is an individual who, from 1937 to 1950, was engaged in business in Woodland, *473 California, doing business as Woodland Rice Company. In 1950, he sold the physical properties of his business to the Rice Growers Association of California.
3. Rice milling involves the buying of raw or rough rice from the growers, processing it to remove the hull from the kernel, milling and polishing the kernel, separating and grading the broken kernels into various categories, placing in containers, and distributing for sale in trade channels. The unit of sale of milled rice in bulk is 100 pounds which, in the trade, is referred to as a pocket. Rice is grown and milled in the Southern States of Louisiana, Texas, and Arkansas, and also in California.
During the times herein pertinent, rice was grown in California under conditions different from those in the South and the milling seasons, operating costs and competitive markets were also different from those of the southern rice milling industry. These differences were recognized by OPA in its orders and in the fixing of ceiling prices.
4. Each of the plaintiffs, during the months of August, September, October, and November, 1946, was engaged in the business of rice milling and milled more than 500 barrels (a barrel is 162 pounds) of rough rice each month.
5. The General Maximum Price Regulation, which by its terms became effective May 11,1942, froze the price, among other things, of milled rice at preexisting prices. Rough rice was not covered by the regulation which excepted raw and unprocessed agricultural commodities.
On May 22, 1942, OPA issued Maximum Price Regulation 150, originally provided to become effective May 25, 1942, but subsequently amended to become effective June 1, 1942. This established specific dollars-and-cents maximum prices for each variety and class of milled rice, except that sold at retail, f. o. b. specified base points in the rice-producing areas per 100-pound bag or pocket of rice. For shipment based on San Francisco to points outside continental limits, the prices were f. a. s. vessel.
6. On June 1,1942, Maximum Price Regulation 150, noted above, rolled back prices at the milling level to the approximate level of prices which had existed during the period from mid-December 1941 to mid-March 1942.
*474 Oil August 19, 1942, Maximum Price Regulation 150 was amended to roll back prices by approximately 10 percent.
7. On January 21,1943, the Secretary of Agriculture, pursuant to authority given him by Executive Order 9280, issued Food Distribution Order No. 10. This order provided in material part as follows:
(b)Restrictions (1) No person shall sell, or otherwise dispose of, except to a governmental agency, or use more than forty percent of the brown, milled, or undermilled rice as to which he is or becomes the first owner; and every person shall set aside for sale to a governmental agency milled rice of the grade 5 or better of one of the classes I to K, inclusive, in an amount equal to sixty percent of the brown, milled, or undermilled rice as to which he is or becomes the first owner. All rice so set aside may be offered for sale by the first owner at no more than ceiling prices established by the Office of Price Administration to a governmental agency in response to announcements or notices issued by such agency that offers for the sale of such rice will be received on specified dates.
The order, by its terms, was made effective January 22,1943.
This order was amended from time to time thereafter, principally to alter the percentage of rice required to be set aside for delivery to the Government. The changes in such percentage were as follows:
(a) Amendment 2, issued July 14, 1943, changed the rate of set-aside to 45 percent of grade 4 or better of classes I to K, inclusive.
(b) Amendment 5, issued July 18, 1944, changed the rate of set-aside to 35 percent, effective August 1, 1944.
(c) Amendment 6, issued October 14, 1944, released all rice, except in California, set aside between October 1 and October 15, 1944, and specified rates of set-aside for the period from October 15 to October 31, 1944, of 35 percent in the case of California millers, and 25 percent of specified grades in the case of other millers.
(d) Amendment 8, issued February 12, 1945, specified a set-aside of 60 percent.
(e) Amendment 9, issued March 9, 1945, required every miller to set aside for the Government all rice milled by him after March 10, 1945, and all rice then owned by him.
*475 (f) Amendment 10, issued July 31,1945, changed the rate of set-aside to 55 percent.
(g) Amendment 11, issued October 9, 1945, but effective October 1, 1945, changed the rate of set-aside to 40 percent.
(h) Amendment 13, issued December 29,1945, changed the rate of set-aside, effective January 1,1946, to 60 percent for California millers and 35 percent for other millers.
(i) Amendment 14, issued January 24, 1946, changed the rate of set-aside, effective February 1,1946, to 70 percent for California millers and 50 percent for all other millers.
(j) Amendment 18, issued September 17,1946, provided in part as follows:
§ 1432.1 (b) Set-aside requirements and restrictions applicable to millers. (1) Beginning September 1,1946, every miller shall set aside in each calendar month for sale and delivery to a governmental agency milled rice of one or more of the grades 1 to 6, including the special grades unpolished milled rice and parboiled milled rice, and of the classes I to XII, all inclusive, in an amount equal to 40 percent of the total combined quantity of brown and milled rice milled by him during such month.
(2) Beginning October 1, 1946, no miller shall make any deliveries of brown or milled rice into civilian channels in any calendar month unless: (i) he has set aside in each preceding calendar month after August 1946 the quantity and quality of milled rice required by (b) (1); (ii) not later than the second business day of each calendar month after September 1946 he offers to sell and deliver to Commodity Credit Corporation (in 100 pound bags of a type and quality specified by said Corporation in its rice purchase announcements issued from time to time and otherwise in accordance with the terms and conditions stated in such announcements) all milled rice required by (b) (1) to be set aside in the preceding month, less any quantities of such rice delivered during such preceding month to governmental agencies, or to persons other than governmental agencies for set-aside credit as provided in (c), and (iii) he has delivered to Commodity Credit Corporation in accordance with the offer required by (b) (2) (ii) all rice offered to and accepted by said Corporation for which the delivery period determined as provided in said rice purchase announcements has passed: Provided, That if the quantity of rice to be offered to Commodity Credit Corporation under (b) (2) (ii) by the second business day of any calendar month constitutes less than a carload lot, it shall be held *476 in inventory and shall be added to the quantity otherwise required to be offered to said Corporation by the second business day of the following month.
* * * * #
(f) Contracts. The provisions of this order and all orders or regulations issued pursuant thereto shall be observed without regard to contracts heretofore or hereafter made or any rights accrued or payments made thereunder.
(g) Petition for relief from hardship. Any person affected by this order who considers that compliance herewith would work an exceptional or unreasonable hardship on him may file a petition for relief with the Order Administrator. Petitions shall be in writing and shall set forth all pertinent facts and the nature of the relief sought. The Order Administrator may take any action with reference to such petition which is consistent with the authority delegated to him by the Administrator. If the petitioner is dissatisfied with the action taken by the Order Administrator, he may, by request addressed to the Order Administrator, obtain a review of such action by the Administrator. After said review, the Administrator may take such action as he deems appropriate, which action shall be final.
(h) Violations. Any person who violates any provision of this order may, in accordance with the applicable procedure, be prohibited from receiving, making any deliveries of, or using rice. Any person who wilfully violates any provision of this order is guilty of a crime and may be prosecuted under any and all applicable laws. Civil action may also be instituted to enforce any liability or duty created by, or to enjoin any violation of, any provisions of this order.
The substance of the provisions quoted above entitled “Contracts,” “Petition for relief from hardship,” and “Violations,” had appeared in the order since its original issuance, although there had been changes of language from time to time.
Changes in the rate of set-aside were made on the basis of changes in estimates of the quantities of rice needed by Government agencies, and of the estimated production of rice. The set-aside of 40 percent to be made during the 1946 milling season as provided by Amendment 18 was arrived at by the Government after the receipt of the crop estimates based on the harvest of the rough rice which had commenced.
*477 In the states served by the southern rice milling industry the harvest season of rough rice lasts 3 or 4 months, and in 1946 the rough rice started to come into the mills in August, with the heaviest movement in September and October.
8. Maximum Price Regulation 518 was issued on March 7, 1944, and established for the first time maximum prices for the sale of rough rice.
9. Although the maximum prices for milled rice remained unchanged until September 24, 1946, amendments to Maximum Price Regulation 150 on milled rice between August 19, 1942, and September 24, 1946, and to Maximum Price Regulation 518 on rough rice, had the actual effect of lowering the price of milled rice by subjecting the millers to increasing costs and by narrowing the grades and types of rice which could be sold under such ceiling prices as follows:
(a) On February 1,1943, MPR 150 was amended to prohibit the addition of freight from the base point to the milling point.
(b) On April 17,1943, MPR 150 was amended to remove brown and undermilled rice from the price category of finished rice.
(c) On October 14,1943, MPR 150 was amended to reduce the ceiling price of brown and undermilled rice.
(d) On April 1,1944, MPR 150 was amended to disallow the primary distributor’s margins, thus reducing the miller’s markup.
(e) On October 15, 1944, MPR 518 was amended to increase the price of the raw, rough rice used by the millers.
(f) On June 26,1946, there were issued two amendments to MPR 518: one imposed the costs of inspections on the millers and the other increased the cost of all rough rice by about 60 cents per barrel.
10. On June 30, 1946, the provisions of the Emergency Price Control Act of 1942, as amended, were terminated in accordance with section 1 b thereof, as amended. On July 25,1946, the President approved the Price Control Extension Act of 1946. This provided in material part as follows:
Sec. 3. Title I of the Emergency Price Control Act of 1942, as amended, is amended by inserting after section 1 thereof a new section as follows:
*478 “PURPOSES AND POLICIES IN THE TRANSITION PERIODS
“Sec. 1A. * * * (e) agricultural commodities.— (1) On the first day of the first calendar month which begins more than thirty days after the date of enactment of this section, the Secretary of Agriculture shall certify to the Price Administrator each agricultural commodity which such Secretary determines to be in short supply. Thereafter, on the first day of each succeeding calendar month the Secretary shall certify modifications of such certification by adding other agricultural commodities which have become in short supply and by removing from such certification such commodities which he determines are no longer in short supply. No maximum price shall be applicable with respect to any agricultural commodity during any calendar month which begins more than thirty days after the date of enactment of this section, unless such commodity is certified to the Price Administrator under this paragraph as being in short supply.
“ (2) (A) Whenever the Secretary of Agriculture determines that maximum prices applicable to any agricultural commodity which is in short supply are impeding the necessary production of such commodity, he may recommend to the Price Administrator such adjustments in such maximum prices as the Secretary determines to be necessary to attain the necessary production of such commodity.
$ % :Ji #
Seo. 11. The Emergency Price Control Act of 1942, as amended, is amended by inserting after section 5 thereof the following new section:
“Seo. 6. (a) For the purposes of this section the base period shall be the calendar year 1940, or in the case of an industry customarily keeping its accounts on a fiscal year basis, the industry’s fiscal year 1940.
“ (b) In order that adequate general price levels shall be established for all commodities to bring about maximum production and employment, no maximum prices shall be established or maintained for any product of a producing, manufacturing, or processing industry (including any industry furnishing service or transportation the charges for which are subject to the Administrator’s control) which do not return on the average to the industry not less than the average dollar price of such product during the base period, plus the average increase in cost of producing, manufacturing, or processing the same accruing since the base period, but the maximum prices for a product shall be deemed in compliance with *479 this standard if such prices on the average are equal to the average current total cost of the product plus the industry’s average over-all profit margin on sales in the base period.
“(e) For the purpose of determining costs under this section, currently or for the base period, the Administrator shall ascertain the costs of a reasonable number of typical producers, manufacturers, or processors and shall follow accepted methods of accov/nting and such fair and reasonable methods of calculation as he shall establish by regulation, including adjustments for temporary cost Abnormalities which may be reasonably anticipated to be eliminated within the three months following the Administrator’s determination, and adjustments for increases in the volume of production which may be reasonably anticipated to be experienced within such three-month period.
“(d) Maximum prices established hereunder shall not be held invalid on account of their failure to return his costs to any particular member of any group involved. ‡ $ * # %
“(i) Nothing in this section shall be construed to require any adjustment in maximum prices except pursuant to an application filed u/nder this paragraph, or be construed to invalidate any maximum price unless there is a failure to make adjustments, in accordance with the procedure prescribed in this paragraph, to such extent as may be required to comply with the standards set forth in this section. Any industry advisory committee may apply to the Administrator for the adjustment of the maximum prices applicable to any product in accordance with the standards set forth in this section, and shall present with the application comprehensive evidence with respect to costs and prices. The Administrator shall consider the evidence so presented and all evidence otherwise available to him, and within sixty days after the receipt of such application, he shall make the adjustments in maximum prices required by this section, or, if he finds that no such adjustments are required, he shall deny the application. If the Administrator neither makes the adjustments in the maximum prices for any product required by this section, nor denies the application for such adjustments, within the sixty-day period prescribed in this paragraph, the industry advisory committee concerned may petition the Emei’gency Court of Appeals, created pursuant to section 204, for relief; and such court shall have jurisdiction by appropriate order to require the Administrator to *480 make such adjustments or deny such application within such time, not to exceed thirty days, as may be fixed by the court. If the Administrator fails to make such adjustments or deny such application within the time so fixed, no maximum price shall thereafter be applicable with respect to any sale of such product by any seller.” [Italics supplied.]
11. A Rice Milling Industry Advisory Committee had been appointed by the Office of Price Administration in the latter part of 1943 to advise, consult with and make recommendations to the Office of Price Administration with respect to industry matters. This committee represented plaintiffs as well as the other members of the rice milling industry. William M. Reid, who was executive vice president of the Rice Millers’ Association and its chief executive officer, served as secretary of the Rice Milling Industry Advisory Committee during all times material herein.
12. Following enactment of the Price Control Extension Act of 1946 on July 25, the chairman of the Industry Advisory Committee on August 2 had the secretary, Mr. Reid, call a meeting of that committee on August 14,1946. This was accomplished by telegram, and the meeting lasting two days was held in Washington, D. C., at the Office of Price Administration with representatives of that office attending. The purpose of the call of the meeting was, as stated in the telegram, “for the purpose of discussing ceiling prices for finished rice in relation to prices for rough rice.”
13. The members of the Rice Milling Industry Advisory Committee at the August 14 meeting stated to the OPA officials present that the ceiling prices for milled rice did not allow millers a generally fair and equitable margin. OPA officials informed the Advisory Committee members that the committee would have to file a formal written application for an increase in price. On the following day the committee presented to OPA a written application for an increase in the price of finished rice but OPA officials informed the committee that the application was not adequate because not in accordance with procedural regulations then in the process of being prepared by OPA. Specific information as to the requirements of the regulation to be issued later was not then given to the committee.
*481 14. At the conclusion of tlie meetings of August 14 and 15, the Nice Milling Industry Advisory Committee was informed that OPA would send accountants and other officials to New Orleans within about 10 days to advise the committee concerning the data that would be required under the new procedural regulation in order to support the industry’s application for price increases. Mr. Reid was told that certain OPA officials, including the chief of the Audit Section, three accountants, the branch economist, and an attorney would be in New Orleans on August 29. Accordingly, a meeting of the Industry Advisory Committee was called for August 29 in New Orleans. On August 27, the meeting was postponed indefinitely because the new procedural regulation had not been issued.
15. On August 19,1946, Mr. Reid, as executive vice president of the Rice Millers’ Association, sent out a newsletter to the membership advising of a meeting of that association on August 24 for the purpose of discussing set-aside and price control provisions with respect to rice. The newsletter, after discussing the matter of set-aside, stated as follows:
3. Price Control.
The maximum prices provided for rough rice now in effect are the prices provided by MPR 518, as amended. (Amendments 1-11 inclusive). Representatives of producers have been aggressive in efforts to secure an increase in the price of rough rice. About ten days ago they gave out the information that an increase of $1.00 per barrel would be granted. On last Saturday I was informed by officials of the OPA and the Department of Agriculture, and by Senator John H. Overton that there is little, if any, chance of securing an increase in the price of rough rice.
The maximum prices provided for finished rice (i. e., milled rice, unpolished rice, brown rice and parboiled rice), now in effect, are the prices provided by 2d RMPR 150, as amended. (Amendments 1-14 inclusive.)
The Price Control Act of 1946, among other things, provides that no maximum prices shall be established or maintained for any product of a processing industry which does not return on the average to the industry not less than the average dollar price of such product during the base period, plus the average increase m cost of proc *482 essing same, accruing since the base period. Further, the Act provides that no adjustment in maximum prices is required except pursuant to an application for adjustment; and continuing, states that the.Industry Advisory Committee may apply to the Administrator for the adjustment of the maximum prices, and shall present with the application comprehensive evidence with respect to costs and prices.
From the foregoing, it will be observed that although the statute requires the OPA to make adjustment in prices under certain conditions, the condition prescribed is that the Industry Advisory Committee shall make application to the Administrator for adjustment and shall present with the application comprehensive evidence with respect to costs and prices. The Rice Milling Industry Advisory Committee have made application to the Administrator for an adjustment in the maximum prices for finished rice in 2d RMPR 150 as amended. The comprehensive evidence required has not been furnished. The application will fail unless the evidence is furnished.
It is my opinion that the California rice industry will present comprehensive evidence satisfactory to the Administrator m support of their application for adjustment in prices for that area. Further, it is my opinion that the southern rice milling industry can provide the evidence if it will. I believe that increases in prices are warranted and that they may be had if a sufficient number of mills will supply the evidence to support the application which has oeen made by the Industry Advisory Committee.
In order to expedite the preparation and presentation of the evidence required, the Accounting Division of the Office of Price Administration has offered to send one of its auditors to New Orleans to meet with the Advisory Committee and help to assemble its evidence, or to meet with anyone designated by the Advisory Committee to prepare and present its evidence. Inasmuch as rice millers generally dislike showing their operating and financial statements to competitors, I suggest and propose the following plan :
(a) That all rice millers who are agreeable to doing so, bring to the membership meeting called to be held in New Orleans Saturday, August 24th, their complete audit statements for the fiscal years ending in 1941 and 1946.
(b) That said audit statements be delivered to a firm of Certified Public Accountants to be selected *483 at the said meeting, said firm of Certified Public Accountants being authorized and directed to make a consolidated price and cost statement for the industry, i. e., a consolidation of the statements of the various mills who furnish such data.
As explained by the official of the OPA Accounting Division, among other things those data must show:
(1) Weighted average cost per barrel of rough rice by varieties for the 1940-41 season, of a reasonable number of typical processors.
(2) Weighted average cost per barrel of rough rice by varieties for the 1945-46 season, of a reasonable number of typical processors.
(3) Weighted average gross proceeds realized by a reasonable number of typical processors in the 1940-41 season from the sale of products and byproducts obtained from a barrel of rough rice of each variety handled.
(4) Weighted average gross proceeds realized by a reasonable number of typical processors in the 1945-46 season from the sale of products and byproducts obtained from a barrel of rough rice of each variety handled.
(5) Detailed statement of operating costs for the fiscal years ending in 1941 and 1946.
(6) Profit and loss statement for the fiscal year 1940-41.
If a reasonable number of typical processors do not supply these data, the Office of Price Administration do not have to make any adjustment in prices, and based upon statements of officials of that Administration, they will not make any adjustment in prices unless such data are furnished. May I repeat, that every miller who is interested in obtaining an increase in the maximum price for finished rice bring to the membership meeting to be held in the Offices of the Association Saturday, August 24, complete detailed audit statements of operations for their fiscal years ending in 1941 and 1946.
16. On August 27, 1946, the following letter was sent to all rice millers in the southern rice milling industry by Mr. Reid as secretary of the Industry Advisory Committee:
The Emergency Price Control Act as amended by the Price Control Extension Act of 1946, provides an additional set of pricing standards for processing industries, such as rice mills. The so-called Barkley Amendment provides that no maximum prices shall be established *484 or maintained for any product of a processing industry ■which does not return on the average to the industry not less than the average dollar price of such product during the base period, plus the average increase in cost of processing the same accruing since the base period. However, the amendment further provides that no adjustment in maximum prices is required except pursuant to an application filed by an industry advisory committee, and that there shall be presented with the application “comprehensive evidence with respect to costs and prices.”
Further, the amendment provides that for the purpose of determining costs currently and for the base period, the Administrator shall ascertain the costs of a reasonable number of typical processors, and shall follow accepted methods of accounting and such fair and reasonable methods of calculation “as he shall establish by regulation.”
The Administrator has issued a procedural regulation outlining methods of obtaining price adjustments. One of the requirements provided in that regulation is that where there are as many as 50 and not over 100 firms in the industry, that cost and price data must be obtained from not less than 25 firms. There are 62 firms listed as commercial rice mills in the Southern States, therefore, cost and price data for the base period (fiscal year 1940-41), and for the latest current year (1945-46), must be supplied by not less than 25 milling firms in order to obtain any adjustment in the prices of finished rice.
The Eice Milling Industry Advisory Committee has filed an application for adjustment in maximum priees for finished rice (i. e., milled rice, converted milled rice, unpolished rice, and brown rice), as provided in 2nd EMPE150, Amendment 11.
Comprehensive evidence with respect to costs and prices for the 1940-41 fiscal year and for the 1945-46 fiscal year must be obtained from 25 or more rice milling firms, in order to support the application which the Committee has made for the industry for an increase in the maximum prices of finished rice. The Industry Advisory Committee know that rice millers generally do not furnish their operating and financial statements to be examined by competitors. The members of the Kice Milling Industry Advisory Committee have neither the desire nor the intention to examine the operating statements of any mill. So that comprehensive evidence required by the statute may be had, the Industry Advisory Committee have engaged the firm of Haskins & Sells, *485 Certified Public Accountants, 1021 Hibernia Building, New Orleans 12, La., to receive operating and financial statements from rice mills, and to prepare from these statements a consolidated statement that will meet the requirements set forth in the statute and in the procedural regulations. No information obtained from mills’ individual statements will be reported to any miller, or to the Office of Price Administration, or to any other governmental agency. The only data that will be disclosed to anyone will be the weighted averages for the industry as a whole.
If the Southern Rice Milling Industry is to maintain its application for adjustment in the maximum prices for rice, it is essential that each rice milling firm forward immediately by registered mail copies of their audit statements of their operations for the fiscal year 1940-41, and for the fiscal year 1945-46, to:
HASKINS <& SELLS, 1021 Hibernia Building, New Orleans 12, La.
It is imperative that every rice milling firm in the industry who desires adjustment in the prices for rice, so as to allow a generally fair and equitable margin for processing and a reasonable profit, forward copies of their audit statements for the two fiscal years stated. Inasmuch as every miller will be benefited by any increase in price which may be secured as a result of this effort, every miller in the Southern Industry should and is expected to cooperate by sending their audit statements for the two fiscal years, namely, the fiscal year 1940-41, and the fiscal year 1945-46.
Funds to cover the costs of the auditors’ fees have already been provided for, and no assessment will be made against any miller who furnishes the information. Further, as soon as the data from the various audits have been consolidated into one statement, each miller will be returned his audit statements.
17. On September 1, 1946, in accordance with section 1A (e) (1) of the Price Control Extension Act of 1946 (finding 10), the Acting Secretary of Agriculture certified that rice was in short supply.
On September 6,1946, the same official certified:
* * * that the continuation of the maximum prices applicable to rough and finished rice on June 30, 1946, would impede the necessary production of said commodity and that an adjustment in such prices is necessary to obtain the necessary production. I, therefore, recom *486 mend to tbe Price Administrator that the maximum price for rough rice be increased $1.00 per barrel and that the maximum price for finished rice be adjusted to reflect this increase of $1.00 per barrel in the cost of rough rice.
The new crop of rice is in process of being harvested. The increase herein recommended is necessary to encourage increased production and orderly distribution of finished rice by assuring the procurement of sufficient rough rice from which to produce the quantities of finished rice necessary to meet commitments on a current basis.
18. As noted above, it had been impossible for the Advisory Committee to file its application for price increases at the August meeting with OPA because the new procedural regulation covering the contents of such applications had not yet been issued. On September 5, 1946, the Advisory Committee gave OPA the required notice for the holding of a meeting in two weeks, on September 19,1946, to submit to OPA whatever new application under the Price Control Extension Act might be required by the new procedural regulation to be issued by OPA. The scheduled meeting had to be postponed from time to time pending issuance of the regulation.
19. On September 10, 1946, a meeting was held in New Orleans between OPA officials and the Industry Advisory Committee. At that meeting OPA officials were able to advise the committee and their accountants, Haskins & Sells, of the contents of the new procedural regulation which had still not been issued. It was understood that Haskins & Sells would collect, summarize and report the data required by the new regulation as to material costs, operating expenses, and profits and losses, of the 25 rice millers selected at that conference as representing typical processors. The 25 mills included the Dore Rice Mill and the International Rice Milling Company, as well as 17 other mills whose claims are included in these suits.[1]
20. At this same September 10,1946, meeting the Industry Advisory Committee provided OPA representatives with *487 information showing that the industry was in a “loss position” and was not recovering total costs. Believing that such information, and the additional information to be furnished in compliance with the procedural regulation soon to be issued, would show that the industry was entitled to an increase in the ceiling prices of milled rice, the OPA economist present recommended that an “interim” price increase for milled rice be granted to relieve the situation while the additional data to be submitted after the procedural regulation was finally issued was being studied.
21. Effective as of September 16, 1946, but not actually issued until September 24, 1946, an interim price increase was granted to the industry increasing the price of milled rice. The increases were embodied in Amendment 17 to Second Bevised Maximum Price Begulation 150 (hereinafter referred to as the interim order). The following Statement of Considerations accompanied the issuance of the interim order:
The Secretary of Agriculture, under section 1 (A) (e) (A) of the Emergency Price Control Act of 1942 as amended, has directed the Price Administrator to increase maximum prices of rough rice by $1.00 per barrel and to adjust maximum prices for finished rice to reflect such increase in the cost of rough rice.
Maximum prices for rough rice have already been increased pursuant to such directive by Amendment 12 to MPB 518. The accompanying amendment makes the required adjustments in maximum prices of finished rice. The Price Administrator has determined that the most feasible method of reflecting this increase is to distribute it among whole kernels, second heads, screenings and brewers rice on the basis of milling yields for the different varieties. The milling yields used for this purpose are those which the rice milling industry has currently submitted to the Office of Price Administration.
In addition, the accompanying amendment increases maximum prices of finished rice to compensate for two recent increases in raw material costs. These increases became effective on July 25, 1946, and millers are just beginning to experience their impact as the 1945 rice crop commences to be harvested. The first of these increases is a result of Amendment 11 to MPB 518 which provides a premium of 2 cents per barrel for each one-tenth of one percent of moisture content below 17 percent *488 down to 14 percent. Previously maximum prices for rough rice were established on the basis of 17 percent moisture content with no premiums for lower percentages. However, it was found that rough rice to be suitable for milling purposes should contain less than 17 percent of moisture and preferably not much more than 14 percent. As a result of this amendment, millers are faced with the prospect of paying additional amounts for their rough rice. It is clear, however, that under present harvesting conditions this premium will not be paid on all rice because some of it will be sold on a wet basis. Since this year’s production of rice is approximately equal to that of last year the Price Administrator is of the opinion that the most equitable method of determining the amount of this increase is to base it upon the production and moisture figures of last year’s crop. On such a basis the Price Administrator is satisfied that 50 cents per barrel represents a fair and equitable estimate of increased costs for the industry as a whole as a result of such amendment. The second of these increases is the result of a requirement of official certification and determination of moisture by the U. S. Department of Agriculture, the expense of which, amounting to 2 cents per barrel, must be borne by the miller.
It appears from an accounting survey conducted by the Office of Price Administration in 1944 and from other information available to this office that rice millers are not now recovering total cost. Under such circumstances, the Price Administrator is of the opinion that an interim adjustment in maximum prices of finished rice is apropriate in order to cover these two known material costs increases. Such adjustment will assure the industry that the maximum prices for finished rice will generally cover total costs for the product.
The Rice Milling Industry Advisory Committee is now preparing a petition for adjustment of maximum prices of finished rice under Section 6 of the Emergency Price Control Act of 1942, as amended. The Price Administrator realizes that a considerable period of time may elapse before the petition has been finally prepared and filed with the Office of Price Administration and a decision reached upon it. The information received as a result of that petition will enable the Administrator to determine the extent of any further adjustment that may be necessary.
22. On September 17,1946, OPA issued Amendment 18 to Maximum Price Regulation 518, increasing the price of rough *489 rice by one dollar per barrel except in California where rough rice prices were set on the basis of a hundredweight, and where the price was increased by the terms of the regulation by 62 cents per hundred pounds. All the rough rice from which was milled the quantities of rice which are the subject of these suits was purchased by plaintiffs from the farmers at the increased price for rough rice provided by Amendment 13 to MPE 518.
23. On September 17,1946, OPA issued a procedural regulation, No. 183, setting forth in detail the kind of information which would have to be submitted with any application for an increase in the price of milled rice under the Price Control Extension Act of 1946. It was the lack of this regulation which prevented the Industry Committee from filing an application for price increases at the meeting with OPA officials in mid-August (finding 13).
24. Following receipt by the industry of advice at the September 10 meeting of the substance of the regulation which was actually issued on September 24, 1946, the Industry Advisory Committee and its accountants, Haskins & Sells, commenced the compilation of the information required by such regulation.
25. On October 16, 1946, the meeting, which had been scheduled for September 19, was held with OPA officials and the application for maximum price increases on milled rice was submitted to the OPA Administrator, pursuant to section 6 of the Price Control Act, as amended by the Price Control Extension Act of 1946. This application was duly supported by comprehensive cost and price information. The document was received at OPA in Washington on October 22, 1946. All accountants assigned to food and grain were assigned to the task of reviewing the information submitted by the committee.
26. On November 18, 1946, OPA issued Amendment 20 to Second Eevised Maximum Price Eegulation 150. This amendment, effective November 18,1946, increased prices for all varieties of milled rice by $0.704 per barrel of rough rice milled. This final order granted the price increases for milled rice requested by the Eice Milling Industry Advisory Committee in the application referred to in finding 25, except *490 for the disallowance of certain future costs. The Statement of Considerations for this amendment read as follows:
This amendment increases the price of finished rice by $0,704 per barrel of rough rice milled. It also increases the markup for primary distributors by 4 cents.
Amendments 17 and 18 to 2d Nev. MPN 150 gave certain interim increases in prices for milled rice, unpolished rice, brown rice, and parboiled rice to assure the industry that the maximum prices for finished rice would generally cover total costs for the product. _ At the time of the granting of this relief, the Nice Milling Industry Advisory Committee was preparing a petition for adjustment of maximum prices for finished rice under section 6 of the Emergency Price Control Act of 1942, as amended. The adjustment above referred to was made to give a certain amount of relief to the industry in the interval before a final adjustment could be made.
Subsequently, the Nice Milling Industry Advisory Committee, pursuant to the provisions of section 6 of the Price Control Act, duly filed an application for adjustment of the maximum prices of finished rice. The petition presented satisfied the requirements of Supplemental Order 183 issued by this Office and has been carefully reviewed and analyzed by the Food Accounting Branch and the Nice Section of the Food Price Division. The amount of increase applied for was $0.79427 in the total value of products and byproducts out-turn from a barrel of rough rice. The petition recommended that this amount, representing the deficiency for which the industry sought adjustment, should be allocated entirely to the maximum prices applicable to finished rice. The Committee further recommended that the amount of the increase be allocated to rice of the several varieties in varying amounts in order to correct some of the distortions which hitherto prevailed between out-turn values of the several varieties.
On a careful analysis of the recommendations submitted in the petition, the amount of the increase requested was calculated to be $0.77198 per barrel of rough rice milled instead of $0.79976. This made a difference of around 3 cents per barrel of rough rice milled before considering the validity of the cost increases. The increase requested, included a factor of $0,166 per barrel of rough rice milled to cover certain cost increases such as repairs, brokerage, packaging materials and property taxes. After due consideration, this Office has disallowed that part of the cost increase due to brokerage and property taxes thereby reducing the amount of *491 $0,166 to $0,098 per barrel of rough rice milled. With this disallowance, the increase to be granted was reduced from $0,772 to $0,704 per barrel of rough rice milled. The amount of increase in out-turn value as proposed by the petition has been reduced therefore, 11.97%; that is from $0,799 to $0,704. In the judgment of the Administrator the increase granted complies with the requirements of section 6 of the Emergency Price Control Act of 1942, as amended.
The accompanying amendment also increases the markup for primary distributors of finished, rice from 30 cents to 34 cents per 100 pounds. This increase is made in accordance with the provisions of section 2 (t) of the Price Control Act to keep this markup in line with the new prices established by this amendment.
In the opinion of the Administrator the maximum prices established by this amendment are generally fair and equitable and comply with all other requirements of the Emergency Price Control Act of 1942 and the Stabilization Act of 1942, both as amended, and all applicable Executive orders.
27. It is the amount of the increase granted by the amendment referred to in the preceding finding which the plaintiffs seek to recover on all deliveries made by them to the defendant during the period September 16,1946, through November 17, 1946, the period during which the interim price increase granted by Amendment 17 to Second Revised Maximum Price Regulation 150 (see finding 21) was in effect.
28. On December 16,1946, Philip B. Fleming, Temporary Controls Administrator, who had succeeded to the duties, among others, of the Administrator of the OPA, issued an order, addressed to William Reid, secretary, Rice Milling Advisory Committee, providing opportunity to show why docket in adjustment proceeding should not be closed.
The committee replied by letter of December 23, 1946, in which it requested that the price increase provided for in Amendment 20 to 2d RMPR 150 be made retroactive either to July 25,1946, the effective date of the Price Control Extension Act, or to August 16, 1946, the date on which the committee first filed an application for an increase in maximum prices under section 6 of the Price Control Extension Act of July 25, 1946. The letter stated that the committee, exercising due diligence, had attempted to avail itself of the benefits of the new pricing standards set forth in section 6 *492 by filing its application on August 16, 1946, in a formal meeting of the committee with OPA officials; that no consideration was given to the application for the stated reason that the application did not comply with the provisions of a proposed regulation which the Price Control Extension Act required the Administrator to issue, but which had not as yet been issued. The letter pointed out that it was not until September 17, 1946, that the procedural regulation known as SO 183 was issued by the Administrator, and that the involved and complex requirements included therein far exceeded those indicated in section 6 (c) of the Act causing an additional period of delay during which time the committee attempted to comply with such requirements. The committee noted that its application under the regulation was completed and filed on October 16,1946, but that further delay in reaching a final decision was caused by the action of OPA in permitting, on November 6, 1946, certain California rice mills to join the proceedings filed by and on behalf of the southern rice industry, despite the fact that on August 16, 1946, OPA officials present at the meeting on that date had stated that the southern rice industry and the California rice' industry would be dealt with separately. The committee urged that in view of the facts related indicating, that the long delay in issuing the filial order was entirely due to the manner in which OPA handled the matter, the effective date of the increase finally allowed should be made retroactive.
The Bice Milling Industry Advisory Committee received no notice of any action taken by the OPA or its successor agencies upon the request that the application of the increase in maximum prices of milled rice should be made retroactive.
29. Following the time the rice millers were required to pay the $1 per barrel increase in the cost of rough rice (September 17,1946), efforts were made by the mills to limit sales of milled head rice to their private customers until the requested increase in the ceiling price of milled rice was granted by OPA. Most of the plaintiffs herein made some sales of milled head rice in bulk quantities to domestic private purchasers, during the period September 16, 1946, through November 17,1946, but such sales were made on a restricted and *493 rationed basis for the purpose of retaining the good will of valued customers, or to protect their brand names in the consumer market, or for some other compelling business consideration.
30. Beaumont Rice Mills suspended all private sales during the period referred to above except for 1,000 pockets of brewers’ rice sold by that firm during the period the interim OPA price applied.
31. Under date of September 20, 1946, the United States Department of Agriculture, under covering letter addressed to rice millers, issued announcements Gr-69 and Gr-75. Announcement Gr-69 was issued for use with a blanket contract which would cover all' shipments by a miller to the Commodity Credit Corporation[2] during the 1946-1947 milling season. Announcement Gr-75 provided a procedure under which deliveries of milled rice to the Commodity Credit Corporation each month would become a separate contract and assigned a separate contract number. This covering letter in part stated:
The quantity of rice required to be set-aside for sale and delivery to governmental agencies under the provisions of WFO-10, as amended, will not be different by reason of a Millers election to use one or the other of the above announcements as they in no way modify the provisions of the Order.
32. Announcement Gr-75 contained the following provisions :
The United States Department of Agriculture hereby announces that Commodity Credit Corporation (hereinafter referred to as CCC) will purchase its requirements of rice as required to be set aside for sale to CCC in accordance with terms of WFO 10, as amended. Purchases will be made subject to the terms and conditions of this announcement.
Millers (as defined in WFO 10, as amended) must submit all offers of milled rice to CCC on “Offer of Sale Form Gro-75” (hereinafter referred to as “Offer of Sale”) in an original and four (4) legible signed copies. *494 Southern Rice Millers must forward such Offers of Sale to Mr. H. J. Solomon, Production and Marketing Administration, U. S. Department of Agriculture, 425 Wilson Building, Dallas, Tesas, and California Rice Millers must forward such Offers of Sale to Mr. Carl A. Waalen, Production and Marketing Administration, U. S. Department of Agriculture, 749 New Appraiser Building, 630 Sansome Street, San Francisco 11, California. Upon acceptance by CCC, the Offer of Sale form showing acceptance by CCC, or other type of notification of acceptance, will be submitted to the Rice Miller.
Enclosed are copies of “Offer of Sale” Form Gro-75, which are to be submitted in an original and four (4) legible signed copies to one of the proper offices shown above whenever milled rice is ready for delivery. Extra copies of the “Offer of Sale” or further details with respect to this announcement may be obtained from either of the above offices.

Terms and Conditions

In submitting an offer to sell, the terms and conditions of this announcement and those set forth in Standard Contract Conditions (Form PM A100), except paragraphs 6, 9, and 21, thereof, shall become a part of the offer to sell and, upon acceptance by the CCC, the offer and acceptance will constitute a valid and binding contract between the Miller and CCC. References to Production and Marketing Administration in Form PMA-100 shall be considered as references to U. S. Department of Agriculture. All offers are to be submitted on “Offer of Sale” Form Gro-75.
1. Quantity: Offers shall be submitted for any quantity in multiples of not less than a minimum carload, and in accordance with Orders and Regulations of the Office of Defense Transportation.
2. Prices: The price to be paid for milled rice delivered shall not exceed the price as set forth in O. P. A. 2nd Revised Maximum Price Regulation 150, and amendments thereto, in effect at the time of delivery. An increase of not in excess of three cents (30) per 100 pounds will be paid by CCC for Milled Rice delivered in new 36 inch, 2.28 or 2.35 yard Osnaburg bags. No. 1 used, 12 oz., or 10.4 oz. burlap bags shall be at a decrease of $0,048 per 100 pounds. Any price differential for special packing should be shown as a separate item on vouchers. Claims for payment should be submitted to Regional Finance Officer, Production and Marketing Administration, U. S. Department of Agriculture, 425 *495 Wilson Building, Dallas, Texas, or 821 Market Street, San Francisco, California. Inspection certificates, shall accompany all claims. Voucher forms for submitting claims may be obtained from the above regional offices.
8. Quality: All milled rice delivered to CCC shall be of one or more of the grades 1 to 6, including the special grades “unpolished milled rice” and “parboiled milled rice,” and of the classes I to XII, all inclusive, as defined in “United States Standards for Milled Rice” effective September 4,1946.
4. Packaging: All milled rice delivered to CCC shall be packaged 100 pounds net in new or No. 1 used 86 inch, 12 oz. or 10.4 oz. burlap bags or in new 36 inch 2.28 or 2.35 yard osnaburg bags. Bag seams shall be closed by machine sewing or carefully hand-sewed to insure acceptance by common or other carrier for safe transportation for export shipment at the lowest rates in effect.
5. Markings: Prior to shipment, each bag shall be plainly marked with durable ink or paint to show name of the Commodity, Commodity Code, net weight, name of Miller, class arid grade, contract number, and such other markings as CCC may prescribe prior to delivery. A marking compound of lampblack and kerosene mixture, or any other marking compound which might penetrate the contents of the bags, or is not waterproof and permanent shall not be used.
6. Delivery: Milled rice shall be delivered f. o. b. cars, trucks or barges at option of CCC at the point or points of delivery specified in “Offer of Sale” Form Gro-75. Delivery shall be made, in accordance with shipping instructions issued by CCC, during the 10-day period beginning of the 14th day following the date of acceptance of the offer by CCC, which 10-day period shall be considered the contract delivery period, or within 10 days after receipt by miller of shipping instructions, whichever is later. Provided, that prior delivery made by miller and accepted by CCC shall be considered a proper delivery under the contract.
7. Inspection: Inspection of the milled rice to be delivered shall be made at miller’s expense and evidenced by an inspection certificate issued by the Production and Marketing Administration or its designee. Such inspection shall be upon miller’s request, a,fter the receipt of shipping instructions and prior to delivery.
8. Termination: CCC will not purchase any milled rice after June 30,1947, or at such time as the set aside provisions for sale to CCC of WFO 10, as amended, are terminated, whichever is sooner.
*496 33. Announcement Gr-69 contained the following provisions :
MILLED RICE PURCHASE ANNOUNCEMENT

September 20,19J/.6.

The United States Department of Agriculture hereby announces that Commodity Credit Corporation (hereinafter referred to as CCC) will purchase its requirements of rice as required to be set aside for sale to CCC in accordance with terms of WFO 10, as amended. Purchases will be made subject to the terms and conditions of the “Milled Nice Contract” Form Gro-69 (hereinafter referred to as Nice Contract), and only one Nice contract will be required for each Miller to cover the entire set-aside under WFO 10, as amended.
Millers (as defined in WFO 10, as amended) should complete Nice Contract Forms in original and four (4) legible signed copies. Not later than October 12, 1946, such executed forms should be forwarded by Southern Nice Millers to H. J. Solomon, Production and Marketing Administration, U. S. Department of Agriculture, 425 Wilson Building, Dallas, Texas, and by California Nice Millers to C. A. Waalen, Production and Marketing Administration, U. S. Department of Agriculture, 749 New Appraisers Building, 630 Sansome Street, San Francisco 11, California. Upon acceptance by CCC, an executed copy of the Milled Nice Contract will be mailed to the Miller.
Enclosed are copies of “Tenders of Delivery” Form Gr-69 which are to be submitted in an original and four (4) legible signed copies to the appropriate office designated above whenever milled rice is ready for delivery. Extra copies of “Tender” forms or further details with respect to this announcement may be obtained from either of the above offices.
34. While the above events were taking place with respect to the increases in the price of rough rice and the making of the application for price relief on milled rice, most of the plaintiffs herein were being urged by the Administrator of the set-aside order to make up deficits in the amounts of milled rice which they had been required to set aside in the previous season (as of July 31,1946).
In August 1946, the Administrator of WFO-10 (the set-aside order), wrote to certain of the plaintiffs, hereinafter identified in the findings applicable to the individual cases, *497 the following form letter, differing only in the quantities of milled rice referred to therein:
This letter is in reference to your deficit position of * * * pockets of rice as of July 31, 1946.
War Food Order 10 does not authorize the release of mills from the obligations of the order under the conditions your mill has operated the past year.
Since it appears from a review of your operations that you will be unable to meet your obligations in full before the new crop year, you are hereby granted an extension of time through December 31,1946, in which to make up your deficit of * * * pockets, on condition that you now agree to tender to Commodity Credit Corporation for immediate delivery, and that on or before December 31, 1946, you do tender to CCC for immediate delivery * * * pockets of rice of a quality acceptable to CCC in addition to any other quantity of rice required to be set aside by WFO-10.
The prompt submission in writing of your acceptance of the conditions of the above agreement is necessary.
35. The above August form letter from the Administrator of WFO-10 was answered by a number of the millers involved in these suits (see findings applicable to individual plaintiffs) setting forth the adverse conditions which had made it impossible for them to comply with the full set-aside requirements of the past season and asking that they be relieved from making up the past year’s deficit from the crop for the current season.
36. Following receipt of the above letters from the millers, the Administrator caused to be sent to such millers a second form letter which was wholly unresponsive to the letters from the millers. From all that appears in this record, the Administrator made no investigation into the conditions relied on by the millers as a valid excuse for failure to meet the set-aside requirements for the past season. This second form letter contained a proposal for a conditional extension of time within which the millers would be required to make up the past year’s deficits and it advised the millers that, their failure to agree to make up such deficits within the time so indicated would bring the millers’ current rice milling operations under the restrictions of section 5 (b) (4) of Amendment 18 to the order prohibiting millers from making *498 any deliveries of milled rice into civilian channels while their mills were in a deficit position with respect to Government requirements for the past season. The letter further stated that if the millers did not agree to the conditions stated therein within five days the provisions of section 5 (b) (4) would be invoked without further delay. The letter concluded with the following statement:
Nothing contained in this letter shall be taken to condone any of your violations of WFO-10, or to preclude this Department from prosecuting such violations in the future if such prosecution is deemed advisable.
37. Although the same ceiling prices applied to sales of milled rice to the Government, and sales to the civilian trade, sales to the Government involved greater expense to the millers. The Government required the use of more expensive bags which had to be individually marked or printed by hand labor; certificates of quality had to be furnished; the rice had to be physically set aside and held awaiting shipping instructions; from 6 to more than 30 days elapsed before the Government made payment, thus increasing the mill’s financing and interest expenses. In general these items of expense were not present in non-Government sales.
38. OPA ceilings on milled rice at the times herein pertinent permitted rice millers a markup for export sales of 4 percent in excess of the domestic ceiling price.
39. OPA ceiling prices in effect during the periods herein pertinent provided a markup which gave rice millers a greater profit on rice packed in consumer-size packages than was obtained on milled rice sold in bulk.
40. Section 6 (a) of the Price Control Extension Act of 1946, under which plaintiffs ultimately received the requested increase in ceiling prices, provided that for the purposes of that section the base period should be the calendar year 1940 or the industry’s 1940 fiscal year.
41. During the fiscal year 1940-1941, a reasonable operating spread for the rice milling industry as a whole, between the cost of rough rice and the selling price of milled rice, was from $1.59 to $1.60 per barrel of rough rice and this spread included a profit of a little more than 26 cents per barrel of rough rice.
*499 42. The prices for milled rice fixed by the September 16, 1946, interim price order [3] did not give the rice milling industry the spread that it had in the base period, the fiscal year 1940-1941, between the selling price of milled rice and the cost of rough rice, nor did the prices for milled rice fixed by the interim price order enable the rice milling industry generally to recover its costs.
43. The demand for milled rice in 1946, at the time of the deliveries which are the subject matter of these suits, far exceeded the supply.
44. Between July 1,1946, and the extension of the Emergency Price Control Act, there were no price controls and during the six weeks commencing July 1,1946, one rice miller sold over 10,000,000 pounds of milled rice at prices per pocket ranging from $3.50 to $4 in excess of the ceiling prices that had been fixed for milled rice. Marketing conditions between September 17, 1946, and November 18, 1946, were about the same, as far as supply and demand were concerned, as during the six-weeks period commencing July 1, 1946.
45. In making the tenders of rice to the defendant, which are the subject of these claims, a number of the plaintiffs made protests. The protesting mills were required by defendant to make the set-aside and deliveries of rice in accordance with the provisions of the set-aside order.
46. Subsequent to the delivery of this rice to defendant, a number of the plaintiffs made claims for payment in amounts computed according to the final ceiling price fixed by 2d Eev. MPE 150, Amendment 20, effective November 17, 1946, but these claims were denied by defendant.
47. The prices for milled rice fixed by final order of November 17, 1946, were determined by OPA pursuant to the provisions of section 6 of the Emergency Price Control Act of 1942, as amended by Section 11 of the Price Control Extension Act of 1946 and were based on information reflecting the condition of the industry generally including current costs and prices, for a period of several months prior to the date of the issuance of the final order in November 1946, and using the newly established base period of 1940.
48. The final order ceiling prices were fair and equitable *500 compensation for the rice involved in these suits at the time that rice was delivered by plaintiffs to defendant, during the period from September 16,1946, to November 17, 1946.[4]
FINDINGS APPLICABLE TO INDIVIDUAL PLAINTIFFS
A. The Arkansas Rice Growers Cooperative Association
49. As noted in finding 34, the Administrator of WFO-10 (set-aside order), in August 1946, sent to the various plaintiffs herein (including the Arkansas Rice Growers Cooperative Association, hereinafter referred to as “Arkansas”), a form letter relating to their deficit position as to a certain number of pockets of rice, as of July 31, 1946, and granting them an extension of time through December 31,1946, within which to make up such deficit, on condition that a tender for immediate delivery be made to CCC and that on or before December 31, 1946, a specified quantity of rice be tendered to CCC in addition to any other quantity of rice required to be set aside by WFO-10.
50. On August 15, 1946, Arkansas wrote to the Administrator in reply to the above-described- form letter and protested being expected to deliver 28,820 pockets of set-aside rice “which we are in deficit” out of the next year’s crop. Arkansas stated that its deficit was the result of having milled a large quantity of wet rice during the season and that wet rice was not acceptable to any of the Government agencies. Arkansas stated that it had understood that if its deficit was caused by millings of wet rice and the deficit could not be made up during the course of the season, it might petition for outright release from the set-aside order. Arkansas pointed out that all rice suitable for Government use was actually offered and sold to the Government in compliance with WFO-10, Amendment 13. Arkansas also re *501 ferred to rice rendered unsuitable for Government use because of stackburn. Arkansas noted that in spite of all this it had delivered to CCC 70,013 pockets and to Puerto Eico 11,500 pockets. Arkansas asked to be relieved of delivering last year’s deficit out of the current year’s crop.
51. In October 1946, the Administrator directed another form letter to Arkansas in which nothing was said about the above letter of August 15, 1946, from Arkansas. He required that acceptance of the Administrator’s proposal for making up the deficit be accepted within five days or prosecution under the law would follow. (See finding 36.)
52. Pursuant to the provisions of Announcement Gr-69, Arkansas tendered and delivered to defendant from Stuttgart, Arkansas, under Contract No. A5pm(Ff)-14, quantities and types of No. 6 or better grade rice for which payment was made at ceiling prices provided for in the interim ceiling price order 2d Eev. MPE 150, Amendment 17. The following table indicates the facts with respect to each delivery, the amounts Arkansas was paid, and the amounts it would have received had payment been made at the ceiling prices contained in the final price order:

Tenia Delivery Interim Final order Difference number Pounds Type of rice date price price claimed

1. 600,000 Zenith__ 10/18/40 $36,150.00 $38,700.00 $2,550.00
2__. {osf’sm .} 10/29/46 29,921.20 32,637.56 2,716.36
3.. 500*000 ZenithlllllHIIIIIIII 11/6/46 38,075.05 41,423.25 3,348.20
4_ 500,000 So. Pearl. 11/9/46 39,020.00 42,760.00 3,740.00
5. 300,000 Prelude. 11/9/46 23,406.00 24,936.00 1,530.00
6_ 200,000 So. Pearl. 11/13/46 15,608.00 17,104.00 1,496.00
7... {«olooo Prelude..""} H/15/46 40,165.86 42,665.60 2,499.74
2,899,500 222,346.11 240,226.41 17,880.30
53. The following table shows deliveries by Arkansas to defendant under Announcement Gr-69 from DeWitt, Arkansas, under Contract No. A5pm(Ff)-18, of No. 6 or better rice, the amounts Arkansas was paid, and the amounts it would have received had payment been made at the ceiling-prices contained in the final price order:

Tender Delivery Interim Pinal order Difference No. Pounds Type of rice date price price claimed

(200,000 Zenith.1 1. 7400,000 Fortuna.1 10/25/46 $77,687.80 $83,076.80 $5,389.00 (400,000 Prolific.)
2-. ffl’000 Prolific.} 10/24/46 64,626.00 69,202.00 4,576.00
2A.. 400*000 Fortuná"”III“III“ 11/7/46 32,684.00 34,308.00 1,624.00
. {443OOO Nira^6.} n/14/46 70,737.63 74,967.74 4,230.21
3.043.000 246.736.33 261.654.64 16.819.21
*502 B. Gulf Coast Bice Mills
54. The form letters referred to in findings 84 and 36 were sent to Gulf Coast Bice Mills (hereinafter referred to as “Gulf Coast”. The record does not disclose the basis on which Gulf Coast protested the requirement that it make up the set-aside deficit for the past season.
55. Pursuant to the provisions of Announcement GB-69, Gulf Coast tendered and delivered to defendant under contract A5pm(Ff)-17 quantities and types of No. 6 or better rice, for which payment was made at ceiling prices provided in the interim ceiling price order 2d Bev. MPB 150, Amendment 17. The following table indicates the facts with respect to each delivery, the amounts Gulf Coast was paid, and the amounts it would have received had payment been made at the ceiling prices contained in the final price order:

Tender Delivery Interim Final order Difference No. Pounds Type of rice date price price claimed

i.... {x^ooo BiueBbmiti::::::::} 10/22/46 861-380-00 $65,720.00 $4,340.00
2 — . Hi; ™ BiueBimit:::;;;:::} 10/28/46 25’690-60 27>507-00 ^816-50
879,600 87,070.60 93,227.00 0,156.60
Gulf Coast, on November 23, 1946, submitted additional invoices, one for $4,340, and the other for $1,816.50, representing the difference between the interim ceiling prices and the increased ceiling prices provided by 2d Bev. MPB 150, Amendment 20. By letter of November 29, 1946, from the Acting Area Fiscal Officer of the Production and Marketing Administration, Department of Agriculture, Gulf Coast was advised in material part as follows:
Paragraph 2 of Terms and Conditions of the contract provide in part as follows: “The price to be paid for milled rice delivered shall not exceed the price as set forth in O. P. A. Second Bevised Maximum Price Begu-lation 150 and amendments thereto in effect at the time of delivery.” Therefore, since Amendment No. 20 of the Second Bevised Maximum Price Begulation 150 was not effective until November 18, 1946, and shipments were made prior to that date, this office is without authority to honor your claim and it is returned herewith.
*503 C. El Campo Rice Milling Company, Inc.
56. The form letters referred to in findings 34 and 36 were sent to El Campo Rice Milling Company, Inc. (hereinafter referred to as “El Campo”). The record does not disclose the basis on which El Campo protested the requirement that it make up its set-aside deficit for the past season.
57. On October 2, 1946, El Campo sent the following telegram to defendant:
Offer subject term and condition announcement GR75 one million pounds US No. 6 or better unpolished Fortuna and four hundred thousand pounds US No. 6 or better unpolished Bluebonnet rice both at OPA ceiling prices in effect on milled rice at time of shipment packed in new twelve ounce burlap pockets FOB T&NO Railway El Campo.
This offer was accepted by telegraph the same day and assigned contract No. A5pm(Ff)-7.
58. El Campo delivered to the defendant a total of 1,400,-000 pounds of milled rice on November 2, 1946, for which it was paid on an invoice submitted without protest at the interim ceiling prices provided by 2d Rev. MPR150, Amendment 17, a total of $119,021. Piad the rice been paid for at the prices contained in the final price order, El Campo would have received $125,419, leaving a balance of $6,398 claimed by El Campo herein.
59. On November 29,1946, El Campo submitted an invoice for the difference between the interim ceiling price and that provided by Amendment 20 in the total amount of $6,398 The following statement was appended to the invoice:
The shipment for which this invoice covers was made pursuant to the requisition provisions of WFO-10, Amendment 18, the vendor being required by that regulation to sell and deliver the rice covered by this invoice at a price which does not provide the vendor with just compensation, and at a price which does not meet the provisions of the Emergency Price Control Act and the Stabilization Act, as amended.
A price now having been determined and having been Srovided by Amendment 20 to 2nd RMPR 150 which oes provide just compensation and which does meet statutory requirements, the vendor hereby makes formal *504 demand for the difference between the amount calculated at the price which provides just compensation and the amount calculated at the price at which these goods were requisitioned.
El Campo received a letter dated December 5, 1946, to the same effect as that quoted in finding 55.
D. Kaplan Rige Mill, Ino.
60. The form letters referred to in findings 34 and 36 were sent to Kaplan Rice Mill, Inc. (hereinafter referred to as “Kaplan”). The record does not disclose the basis on which Kaplan protested the requirement that it make up its set-aside deficit for the past season.
Defendant instituted a civil action against Kaplan for an injunction prohibiting sales of rice in civilian channels until the alleged accumulated deficit in the set-aside requirements of WFO-10 of 42,519 pockets of rice, as of October 31,1946, was made up. In February 1947, a consent order was entered in this case under which this restraint was imposed on Kaplan.
61. Under date of October 2,1946, Kaplan sent the following telegram to CCC:
We offer subject to the terms and conditions of Announcement Gr-75 1,700,000 pounds US No. Six or better Early Prolific unpolished rice stop 700,000 pounds US No. Six or better Fortuna unpolished rice stop 300,-000 pounds US No. Six Zenith unpolished rice all at milled rice ceiling prices at time of shipment packed in new 2.28 Osnaburg bags three cents additional for bags originating carrier T&NO Railroad.
This offer was accepted by telegram the same day and assigned contract No. A5pm(Ff )-9.
On November 7, 1946, Kaplan sent a telegram to CCC which was identical to the telegram just quoted, except that it referred to 1,200,000 pounds of Rexoro, 500,000 pounds of Fortuna, 100,000 pounds of Early Prolific and 300,000 pounds of Zenith. This offer was accepted by telegram the following day, and assigned contract No. A5pm(Ff)-91.
Kaplan delivered a total of 2,700,000 pounds of milled *505 rice under the former of these contracts to the defendant between September 16 and November 17,1946, and was paid for such rice at the interim ceiling price on invoices submitted without protest a total of $203,090.50. The value of this rice computed according to the final ceiling price order was $217,731, leaving a balance of $14,640.50 claimed by Kaplan. Kaplan delivered a total of 820,000 pounds of milled rice under the second of these contracts, some of which was delivered on November 18, 1946. The evidence of record shows that 520,000 pounds was delivered on that day; however, the defendant admits that of the 820,000 pounds delivered, 500,000 pounds were delivered by November 17, 1946. The value of this rice computed according to the final ceiling price order was $75,160.50, leaving a balance of $2,250 claimed by Kaplan on this transaction. Invoices were submitted at the ceiling prices provided by 2d Rev. MPR 150, Amendment 20, but the plaintiff was paid according to the interim ceiling prices a total of $72,910.50 for the 820,000 pounds of rice. On November 27, 1946, the plaintiff submitted supplemental invoices claiming an additional $14,-640.50, representing the difference between the interim and the final ceiling as to the 2,700,000 pounds only, but this claim was disallowed by CCC by letter of June 13, 1947. The plaintiff in its claim, referred to above, represented in material part as follows:
TWO
That under said order WFO-10, your petitioner was required to make an offering of its set-aside or cease all sales and deliveries into any civilian channels; it being given no choice, with prices fixed at prevailing prices on date of offering.
THREE
That at the time of the offering, the Emergency Price Control Act had been amended by the Price Control Extension Act of 1946, providing for a new pricing standard ; and the Rice Milling Industry Advisory Committee was then preparing an application for adjustment in prices to meet the requirements of the new Statute of 1946; all of which was well known to your petitioner and the Commodity Credit Corporation;
*506 FOUR
That by the terms of WFO-10, petitioner was not permitted the freedom of choice of holding its rice until such time as adjustment in prices could be made and thereby obtain the benefits of increases in price shown to be required;
****>&
SEVEN
That because of the facts herein set out, your petitioner was forced to invoice its rice for the sum of $14,640.50 less than the new price eventually placed thereon effective November 18, 1946; That not having been granted an opportunity of choice in waiting for the new price which had been approved but not yet fixed, petitioner is entitled to receive from the Commodity Credit Corporation this difference, or the sum of $14,640.50, and demand is hereby formally made for same in accordance with the attached corrected invoices.
E. Lake Bice Mill, Inc.
62. Under date of October 4, 1946, Lake Bice Mill, Inc. (hereinafter referred to as “Lake”), submitted an offer to CCC to sell it the quantity of rice required to be set aside under War Food Order No. 10, as amended, at the scale of prices provided in 2d Bev. MPB 150 at the time of delivery. This offer was accepted by CCC and assigned contract No. A5pm(Ff)-27.
63. On October 21, 1946, Lake commenced, and on November 2,1946, completed delivery to defendant of 1,000,000 pounds of Bexoro milled rice under Contract No. 27. On November 18, 1946, Lake submitted invoices covering these deliveries and claimed payment therefor in the sum of $96,683 computed according to the final ceiling price order. Defendant paid for the rice according to the interim ceiling price order in the amount of $91,377.15, disallowing the difference of $5,306 now claimed by Lake.
64. The form letters referred to in findings 34 and 36 were sent to Lake. The record does not disclose the basis on which Lake protested the requirement that it make up its past year’s deficit out of the current season’s rice.
*507 F. LoviNG Rice Mills
65. Under date of October 2, 1946, Loving Rice Mills (hereinafter referred to as “Loving”) offered to sell to CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” 1,500,000 pounds of Rexoro No. 6 unpolished rice at “ceiling price.” This offer was accepted October 4,1946, and assigned contract No. A5pm (Ff) -22. Under date of October 28,1946, Loving requested that this be amended to cover 80,000 pounds of Zenith, 100,000 pounds of Bluebonnet, and 1,820,000 pounds of Rexoro, which was agreed to by CCC the same day.
Under date of October 9, 1946, Loving offered to sell to CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” 1,000,000 pounds of Rexoro No. 6 unpolished rice at “ceiling price for milled rice.” This offer was accepted October 11, 1946, and assigned contract No. A5pm(Ff)-42. Under date of November 7,1946, Loving requested that this be amended to cover 82,000 pounds of Blue Rose, and 918,000 pounds of Rexoro, which was agreed to by CCC the same day.
66. On November 2, 1946, Loving completed delivery to defendant of a total of 1,500,000 pounds of milled rice under the former of the above contract designations, for which Loving was paid, on invoices submitted without protest, the sum of $139,645.00, computed according to the interim price order. The value of this rice computed at the final price order prices was $148,591.40, leaving a balance of $8,946.40 claimed by Loving herein.
67. On November 16, 1946, Loving completed delivery to defendant of a total of 1,000,000 pounds of milled rice under the second of the above contract designations. Vouchers were submitted by Loving claiming payment of $98,200.04 for this rice computed according to the final price order. Loving was paid the sum of $92,299.98 computed according to the interim price order, leaving a balance of $5,900.06 claimed by Loving and disallowed by defendant.
68. Loving delivered to the defendant a total of 1,500,000 pounds of milled rice under the former of these contracts between September 16 and November 17, 1946, for which it was paid on invoices submitted without protest at the *508 interim ceiling prices a total of $139,645. Under the second contract, Loving delivered to the defendant within the same period a total of 1,000,000 pounds of milled rice. Three vouchers were submitted by the plaintiff for this rice computed at the increased ceiling prices under Amendment 20. The plaintiff was paid for this rice $92,299.98 computed at the interim ceiling price, the amount of the difference between that and the final ceiling price having been disallowed.
69. Plaintiff, on December 7,1946, submitted to defendant vouchers claiming the additional amounts of $8,946.40 and $5,900.06 as just compensation for the above-described rice, stating in part:
A price now having been determined and having been provided by Amendment 20 to 2nd EMPE 150 which does provide just compensation and which does meet statutory requirements, the vendor hereby makes formal demand for the difference between the amount calculated at the price which provides just compensation and the amount calculated at the price at which these goods were requisitioned.
These claims were denied by defendant on June 16,1947.
70. Loving’s rice mill was located at Crowley, Louisiana, as were the mills of the Dore Eice Mill and the International Eice Milling Company. All of these mills were about the same size, were engaged in substantially the same type of milling operations, purchased their rough rice in the same area, and their labor was drawn from the same area, at the same rates of wages.
G. Mermentau Eioe Mill Compant, Inc.
71. Under date of October 2, 1946, Mermentau Eice Mill Company, Inc. (hereinafter referred to as “Mermentau”), offered to sell to CCC, “pursuant to CCC Eice Purchase Announcement Gr-75,” 300,000 pounds of Early Prolific unpolished rice at “ceiling price.” This offer was accepted on October 4, 1946, and assigned contract No. A5pm(Ff)-21, Under date of October 11, 1946, Mermentau made a similar offer to sell 300,000 pounds of Blue Eose unpolished rice at “Ceiling Price at Time of Shipment.” This offer was *509 accepted on October 14, 1946, and assigned contract No. A5pm(Ff)-44.
72. Mermentau, on October 12, 1946, delivered to defendant 300,000 pounds of milled rice under Contract No. A5pm(Ff)-21 for which, it was paid on invoices submitted without protest at the interim price totaling $22,550. The value of this rice computed according to the final ceiling price was $24,757.50, leaving a balance of $2,207.50 claimed by Mermentau.
73. On October 23, 1946, Mermentau delivered to defendant 300,000 pounds of milled rice under Contract No. A5pm(Ff)-44 for which it was paid on invoices submitted without protest at the interim price totaling $23,596.50. The value of this rice computed according to the final ceiling price was $25,917 leaving a balance of $2,320.50 claimed by Mermentau.
74. On November 22, 1946, Mermentau submitted to CCC supplemental invoices claiming the difference in the price of the rice between the amount it received and the amount as computed pursuant to Amendment 20. The claims were refused on June 13,1947.
75. On or about August 15, 1946, the Administrator of WFO-10 sent Mermentau the form letter referred to in finding 34 regarding Mermentau’s deficit. On August 20, 1946, Mermentau replied stating that the rice referred to had been tendered to CCC and refused on account of the quality. The letter further stated:
* * * we feel that we have shown our good faith and have made an effort to comply with the regulations.
Due to existing uncertainties, we are sorry that we cannot accept the proposition indicated in your letter. It is our desire to make this deficit up, but we don’t care to accept any concrete proposition until we know what the program for this year will be. We refer here to the grade requirements.
Just as soon as the new program is announced, we will take this matter up with you again.
76. Thereafter, on March 6, 1947, defendant, upon the affidavit of the Administrator of WFO-10, filed a complaint for an injunction against Mermentau alleging that Mer-mentau had failed to fully observe the requirements of the *510 set-aside order and was in a deficit position for a period including the period of the deliveries which are the subject of this suit. Mermentau denied it was in arrears in observing the set-aside order, but a temporary restraining order was issued preventing Mermentau from making any deliveries of rice into civilian channels. On March 24, 1947, the complaint for an injunction was dismissed.
H. Mouton Rice Milling Company
77. Pursuant to the provisions of CCC Rice Purchase Announcement Gr-77, Mouton Rice Milling Company (hereinafter referred to as “Mouton”) tendered and delivered to CCC quantities and types of rice at “OPA milled rice ceiling price on date of shipment” payment for which was made on invoices submitted without protest at the ceiling prices provided for in the interim ceiling price order. The following table indicates the facts with respect to each tender and delivery and the amounts Mouton would have received had. payment been made at the ceiling prices contained in the final price order:

Delivery Interim Final Difference Contract No. Pounds Type of rice date price price claimed

ASpm(Pt)-43. 80,000 So. Pearl un- 10/24/46 $6,440.00 $7,120.00 $680.00 polished.
A5pm(Pf)-46. 80,000 Zenith. 10/25/46 6,194.00 6,772.00 678.00
A5pm(Ff)-56. 160,000 So. Pearl. 11/ 1/40 12,552.00 13,776.00 1,224.00
A6pra(Pi)-79.{so!000 lerda”1""!"}11/9/46 12>388'0() 13,544.00 1,156.00
480,000 37,574.00 41,212.00 3,638.0
78. On November 25, 1946, Mouton forwarded to CCC supplemental invoices claiming the difference on the rice delivered between the amount it received and the amount as computed pursuant to Amendment 20. The letter of transmittal read in part as follows:
Since we shipped six cars of rice to the C. C. C. just prior to the increase in prices on milled rice, we feel like we ought to be reimbursed for this difference in view of the fact that the increase in prices confirmed the fact that the rice millers were placed in a “squeeze.”
79. On August 15, 1946, the Administrator of WFO-10 wrote Mouton the form letter discussed in finding 34 concerning Mouton’s deficit position on the previous season’s set- *511 aside orders. On September 2, 1946, Mouton replied that through no fault of Mouton 15,000 barrels of rice of the previous season had been stackburnt and was musty and was not fit for Government use; that on the nest crop of rice Mouton sent to the Government all rice that was 15 percent or under in moisture — a fact which could be confirmed by the Government inspector in Mouton’s office. Mouton pointed out that although the past season had been even wetter than the previous one, the Government had received all the dry rice milled. Mouton noted that on the discontinuance of OPA it had about 2,500 pockets of rice which had cost Mouton an excessive amount because of the rice milling poorly at the end of the season; that offers of $2 or $3 above the discontinued ceiling prices were received by Mouton for this rice from domestic sources, but that CCC in Dallas had refused to accept Mouton’s offer of rice at these prices on the ground that it would not pay above the former ceiling prices. Mouton stated that it could not commit itself to making up its set-aside deficit by November 30,1946, because of the many unknown factors that could affect its operations that fall, such as bad weather which might ruin half the crop, or a commercial squeeze. Mouton assured the Government that it would do everything it could to make up the deficit.
80. In reply to the above letter, the Administrator of WFO-10 wrote Mouton the form letter set forth in finding 36, and on March 31,1947, instituted injunction proceedings against Mouton charging Mouton with being in a deficit position on deliveries of milled rice to defendant for a period including the dates of the deliveries to defendant which are the subject of this claim, and stating that the Government was entitled to equitable relief requiring Mouton to comply with set-aside orders and to prohibit Mouton from making deliveries of rice from its current rice production into civilian channels until the set-aside deficits were made up. Thereafter, by consent order, Mouton was restrained and prohibited from delivering into civilian channels any of its current rice production, except when specifically released by the Order Administrator, until the accumulated set-aside deficit had been made up.
*512 I. National Rice Mills, Inc.
81. Under date of October 28, 1946, National Rice Mills, Inc. (hereinafter referred to as “National”), offered to sell to CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” 51,100 pounds of Blue Rose, 118,200 pounds of Prolific, and 500,000 pounds of Rexoro rice, at “ceiling price time of shipment,” but with the following notation: “We reserve the right to file claim for additional amount because ceiling does not provide just compensation.” This offer was accepted on October 29, 1946, and assigned contract No. A5pm(Ff)-69.
Under date of October 30, 1946, National submitted a similar offer covering 85,500 pounds of Blue Bonnet, 42,000 pounds of Prolific, and 125,100 pounds of Zenith, with the same provision as to price, and containing the same reservation. This offer was accepted October 31,1946, and assigned contract No. A5pm(Ff)-72.
Under date of November 1, 1946, National submitted a similar offer, covering 178,300 pounds of Fortuna, 39,500 pounds of Zenith, 42,000 pounds of Prolific, 65,600 pounds of Zenith, 153,700 pounds of Blue Rose, and 225,100 pounds of Rexoro, with the same provision as to price, and containing the same reservation. This offer was accepted November 4, 1946, and assigned contract No. A5pm(Ff)-83.
82. Prior to November 18, 1946, National made delivery of some of the rice offered and accepted under the above contracts, and on November 18,1946, submitted to defendant vouchers claiming payment for the rice at prices contained in the final price order. In each case defendant disallowed the difference between the amount claimed and the value of the rice computed according to prices contained in the interim order. The following table indicates the facts with respect to each delivery, the amounts National was paid, and the amounts it would have received had payment been made at the ceiling prices contained in the final price order:

Delivery Interim Final order Difference Contrató No. Pounds date price price claimed

69.-.- 169,300 11/8 /46 $13,018.69 $14,234.72 $1,216.03
72. 252,600 11/ 6/46 20,837.66 22,464.06 1,626.40
83. 450,700 11/13/46 39,083.16 41,379.79 2,296.63
872,600 72,939.61 78,078.57 6,139.00
*513 83. The form letter set forth in finding 34 concerning the past season’s set-aside deficit was sent to National. The record does not disclose what response National made to such letter, although the second form letter, referred to in finding 36, rejecting the miller’s reasons for the deficit, was also sent to National.
J. Pritchard Rice Milling Company, Inc.
84. Under date of October 1,1946, Pritchard Rice Milling Company, Inc. (hereinafter referred to as “Pritchard”), offered to sell to CCC the quantity of rice it was required to set aside under War Food Order No. 10, as amended, at the price set forth in 2d Rev. MPR 150 at the time of delivery. This offer was accepted by CCC on October 3, 1946, and assigned contract No. A5pm(Ff)-10.
Pritchard delivered to defendant quantities of milled rice pursuant to the above order, submitting thereafter, and without protest, vouchers claiming payment at prices contained in the interim price order. Pritchard was paid at the interim order prices and now claims as just compensation the difference between the amounts received and the value of the rice computed in accordance with the prices set forth in the final order as follows:

Quantity Delivery Interim ffintA order Difference (pounds) date price price claimed

200,000 10/18/16..... $18,918.00 $20,122.00 $1,204.00
400,000 10/23/46.-__ 36,975.00 39,425.00 2,450.00
600,000 55,893.00 59,547.00 3,654.00
85. On December 31, 1946, Pritchard submitted invoices claiming the difference shown above. The record does not indicate what if any action was taken.
86. Pritchard received both form letters relative to set-aside deficiencies noted in findings 34 and 36. The record does not indicate what grounds Pritchard advanced for its deficit position.
K. Producers Rice Mill, Inc.
87. Under date of October 7, 1946, Producers Rice Mill, Inc. (hereinafter referred to as “Producers”), offered to sell to CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” 600,000 pounds of Prelude unpolished rice, as “ceil *514 ing price milled rice.” This offer was accepted by CCC on October 9, 1946, and assigned contract No. A5pm(Ff)-33.
Under date of November 6,1946, Producers made a similar offer covering 600,000 pounds of Nira unpolished rice. This offer was accepted on November 8, 1946, and assigned contract No. A5pm (Ff)-92.
88. On October 22, 1946, Producers delivered to defendant 600,000 pounds of milled rice under the first contract mentioned above (-33) for which it was paid the sum of $46,356.20 on an invoice submitted without protest, computed on the basis of the interim ceiling price order. The value of this rice computed according to the final ceiling price order was $49,287.20, leaving a balance of $2,931 claimed by Producers as just compensation.
89. On November 16,1946, Producers delivered to defendant 200,000 pounds of milled rice under the second contract designation above (-92) and submitted invoices claiming payment at prices contained in the final price order amounting to $18,582. Defendant disallowed the amount billed which was in excess of the interim price and paid Producers $17,658, leaving a balance of $924 claimed by Producers as just compensation.
90. On August 19, 1947, the plaintiff sent the following letter to the CCC:
We are enclosing Public Voucher Serial Number A 200201 in the amount of $3855. This claim covers all rice shipped by us prior to November 20 and is for the difference between the amount paid by the Government for the rice at the price at which it was required and the amount calculated at prices subsequently determined by the OPA as being required by law.
Our contention is that prior to Amendment 20 to the second RMPR 150 that rice prices were not compensatory and were not that which was required by the law.
The claim was denied by letter of December 16,1947.
L. River Brand Rice Mills, Ino.
91. River Brand Rice Mills, Inc. (hereinafter referred to as “River Brand”), entered into 11 separate contracts covering the delivery of milled rice during the period from Sep *515 tember 16 to November 17,1946. Only seven of these are in evidence. Each of these seven was in the form of an offer from Eiver Brand of a specified quantity of milled rice, “pursuant to CCC Eice Purchase Announcement Gr-75,” at “Milled Eice Ceiling Price at time of shipment.” Each such offer was accepted by CCC, and assigned a contract number. The dates of the offers, the quantities of rice covered, the dates of acceptance, and the contract numbers were as follows:
Date of ac-Date of offer Quantity (pounds) ceptance Contract No.
Oct. 24,1946 80,000 Ark Rose. Oct. 25,1946 A5pm(Ff)-58
Oct. 24,1946 1,300,000 various types. Oct. 25,1946 A5pm(Ff)-59
Oct. 24,1946 500,000 Prelude_ Oct. 25,1946 A5pm(Ff)-61
Oct. 24,1946 1,350,000 various types.. Oct. 25,1946 A5pm(Ff)~62
Oct. 27,1946 1,810,000 various types. Oct. 28,1946 A5pm(Ff)-67
Oct. 27,1946 1,500,000 various types. Oct. 28,1946 A5pm(Ff)-68
Oct. 27,1946 1,100,000 various types. Oct. 28,1946 A6pm(Ff)-66
Each of these offers contained the following notation on the reverse side:
This offer is made under protest on the ground that the price at which we are required to offer does not afford the seller just compensation as required by Amendment Number 5 of the Constitution of the united States. Seller reserves the right to make claim for an additional amount which would provide just compensation for the property hereby offered.
The only information in the record with respect to the other four contracts is that they bore the numbers A5pm(Ff)-26, A5pm(Ff)-36, A5pm(Ff)-37, and A5pm-(Ff)-55. However, defendant has admitted deliveries of milled rice under these four contract designations and the payment therefor on the basis of the interim price order.
For convenience, the contracts will hereafter be separately identified by the last two digits of the contract number.
92. The quantities of milled rice set forth in the table below were delivered to defendant on the dates indicated. Eiver Brand was paid for these quantities at prices computed according to the interim ceiling price order. The value of this rice calculated according to the final ceiling price order is shown below and the difference in each instance between the interim and final order prices is claimed by Eiver Brand as just compensation.

*516
Delivery Interim Final order Difference Contract No. Pounds date price price claimed

20 — . 2,530,000 11/1/46 $213,937.53 $224,413.28 $10,475.75
36. 1,000,000 11/16/46 80,246.00 84,165.00 3,919.00
37. 1,600,000 10/31/46 117,681.75 125,324.75 7,643.00
55. 500,000 10/29/46 38,698.00 42,164.00 3,466.00
58. 80,000 11/5/46 6,259.60 6,864.80 605.20
59. 1,300,000 11/7/46 108,593.00 114,617.50 6,024.50
61. 500,000 11/16/46 37,714.00 39,784.00 2,070.00
62. 1,150,000 11/16/46 97,769.55 102,750.05 4,980.50
66. 700,000 11/16/46 59,758.00 63,726.50 3,968.50
67. 210,000 11/9/46 18,382.45 19,317.45 935.00
68. 1,300,000 11/16/46 100,650.00 106,038.50 5,388.50
10,870,000 879,689.88 929,165.83 49,475.95
In submitting vouchers for payment for such deliveries, Eiver Brand claimed, on contracts 26, 37, 55, 58, and 59, the prices set forth in Amendment 17. Vouchers claiming payment for deliveries under the other contracts were dated on or subsequent to November 16,1946, and claimed payment at the prices set forth in Amendment 20; CCC disallowed the amount so claimed in excess of the prices set forth in Amendment 17.
Eiver Brand thereafter submitted further vouchers on contracts 36, 58, 59, 62, 66, and 67, again claiming the additional amounts allowed by Amendment 20. These claims were denied on June 13,1947.
M. The Superior Eice Mill Company
93. The form letter described in finding 34 was sent to Superior Eice Mill Company (hereinafter referred to as “Superior”) in connection with Superior’s deficit in set-aside requirements for the 1945-46 milling season. On August 26, 1946, Superior replied to the Administrator’s letter and stated that Superior had, from December 1945 to the end of the operating season, submitted to the Government certificates of quality showing that deliveries of milled rice to buyers, other than the Government, were of rice below U. S. #5 in grade, and that although the originals of the certificates should be in the WFQ Administrator’s files, Superior was sending copies thereof to the Administrator.
Upon receipt of this reply, the Administrator of WFO-10 wrote Superior the form letter set forth in finding 36.
94. Under date of September 30, 1946, Superior offered to sell to CCC the quantity of milled rice it was required to set aside under the provisions of the War Food Order *517 No. 10, at the price specified in 2d Rev. MPR 150 at the time of delivery. The offer was accepted October 2, 1946, and assigned contract No. A5pm(Ff)-6.
95. Between September 16 and November 17, 1946, Superior delivered 1,100,000 pounds of milled rice under this contract, and was paid therefor the sum of $106,597.90. In submitting vouchers covering its delivery under this contract, Superior claimed without protest the prices specified in Amendment 17 on all but the final voucher; that voucher, dated November 16, 1946, and covering 100,000 pounds of rice, was computed at the prices set forth in Amendment 20, but CCC disallowed all in excess of the prices specified in Amendment 17. The value of the rice delivered, calculated according to the final ceiling price order was $113,-796.40, leaving a balance of $7,198.50 claimed by Superior as just compensation.
Under date of December 6, 1946, Superior, through its attorney filed a claim with CCC for $7,198.50, being the difference between the prices specified in Amendment 17 and Amendment 20. This claim was eventually disallowed on June 13,1947.
N. Smith Rice Mill Company
96. Under date of October 2, 1946, Smith Rice Mill Company (hereinafter referred to as “Smith”) offered to sell to CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” 930,000 pounds of Prelude unpolished rice at “ceiling price.” This offer was accepted on October 4,1946, and assigned contract No. A5pm(Ff)-19.
Under date of October 9,1946, Smith made a similar offer to sell 2,000,000 pounds of Nira. This was accepted October 10, 1946, and assigned contract No. A5pm(Ff)-38.
Under date of October 23, 1946, Smith made a similar offer to sell 2,500,000 pounds of Nira. This offer was accepted the same day, and assigned contract No. A5pm(Ff)-60.
Each of these offers contained the following provision:
This offer is made under protest with respect to the inadequacy of the price offered, and with reservation of our constitutional right to demand judicial determination by due process of fair, just compensation for property taken and delivered.
*518 97.The quantities of milled rice set forth in the table below were delivered to defendant on the dates indicated and were paid for at prices computed according to the interim ceiling price order. The following table also shows the value of the rice computed according to the final ceiling price order and the difference in each instance between the interim and final order prices which is claimed by Smith as just compensation.

Delivery Interim Final order Difference Contract No. Pounds date price price claimed

19. 930,000 10/16/46 $74,979.38 $80,407.60 $5,428.12
38. 2,000,000 10/24/46 185,069.99 196,196.73 11,126.74
60. 2,500,000 11/14/46 229,147.32 242,569.02 13,421.70
5,430,000 489,196.69 519,173.25 29,976.56
In submitting vouchers covering these deliveries, Smith claimed the prices specified in Amendment 17. Under date of December 4,1946, Smith submitted invoices claiming the difference between the prices set forth in Amendment 17 and those in Amendment 20. This claim was denied on December 11,1946.
During the period when the above deliveries were being made to the Government, Smith made only a few deliveries of rice to the trade, amounting to about three or four carloads to old customers.
O. Imperial Eice Milling Company, Inc.
98. Under date of October 2, 1946, Imperial Eice Milling Company, Inc. (hereinafter referred to as “Imperial”), offered to sell to CCC, “pursuant to CCC Eice Purchase Announcement Gr-75,” 500,000 pounds of Prolific and 400,000 pounds of Zenith milled rice, “at ceiling price basis Government Grading Certificate at Crowley, Louisiana.” This offer also contained the following provision:
The above rice offered under protest because ceiling prices are below cost of production and does not allow a reasonable profit. Any advance in ceiling prices to be retroactive in order to cover this sale.
This offer was accepted October 4, 1946, and assigned contract No. A5pm(Ff)-23.
99. On October 23, 1946, Imperial completed delivery to defendant of the 900,000 pounds of milled rice for which *519 it was paid on invoices submitted without protest the sum of $68,350 at prices specified in the interim order. The value of this rice computed according to the final order was $74,725 and the difference of $6,375 is claimed by Imperial as just compensation.
100. Between September 16 and November 17, 1946, Imperial delivered 900,000 pounds of milled rice to the defendant for which it was paid on invoices submitted the sum of $68,350 at the prices specified in Amendment 17. On November 26, 1946, Imperial submitted supplemental invoices claiming $6,375, being the difference between the amount it had received in payment and the amount as computed on the basis of Amendment 20. Payment of the supplemental invoices was denied by the CCC on December 3, 1946.
101. The Administrator of WFO-10 wrote Imperial the letter set forth in finding 34 to which Imperial replied on August 28,1946, stating that it had made every effort to comply fully with the set-aside provisions of WFO-10 during the 1945-46 rice crop marketing year but that a large percentage of the last crop harvested had contained a high percent of moisture; that it had set aside and offered to the Government all of its better quality rice and had furnished the Administrator with certificates of inspection covering all the rice on hand as evidence that its rice contained a higher moisture content than was acceptable to Government agencies ; that 2,000 pockets of rice loaded for shipment to Government agencies had been rejected, whereupon Imperial had had to go to the expense of unloading and repacking the rice for sale to customers willing to accept rice of that quality; and finally, that the deficit complained of by the Administrator was the result of the inability of Imperial to perform the impossible.
102. On January 29, 1947, upon affidavit of the Administrator of WFO-10, defendant instituted a petition for injunction against Imperial charging it with failure to fully observe the requirements of the set-aside order for a period including October 1946, and praying that the mill be restrained from making any deliveries into civilian channels except when specifically authorized by the Administrator until Imperial had made up “its accumulated deficit of *520 rice wbicli heretofore should have been delivered to Governmental agencies.” On the same date, January 29, 1947, and without notice to Imperial, a temporary restraining order was issued. On February 18, 1947, a consent decree was entered under which provision was made for the milling company to make up the deficit amounts.
103. During the year 1946 Imperial was located at Crowley, Louisiana, where also were located the mills of the Dore Rice Mill and the International Rice Milling Company. All three mills were about the same size, were engaged in substantially the same type of milling operations, purchased their rough rice in the same area, drew their labor from the same area and paid their labor the same rates of wages.
P. Tyrrell Rice Milling Company
104. Tyrrell Rice Milling Company (hereinafter referred to as “Tyrrell”) made five telegraphic offers of milled rice to CCC during the period from September 16 to November 17,1946, each of which was accepted by CCC. These offers were made “subject to terms and conditions of Announcement Gr-75,” “at milled rice ceiling at time of shipment.” The dates of such offers, the quantities covered, the dates of acceptance, and the contract numbers assigned were:

Date of Date of offer Quantity (-pounds) acceptance Contract No.

Oct. 2,1946 500,000 various___ Oct. 3,1946 A5pm(Ff)-12
Oct. 7,1946 381,400 various.... Oct. 8,1946 A5pm(Ff)-29
Oct. 10,1946 240,000 various... Oct. 10,1946 A5pm(Ff)-41
Oct. 16,1946 300,000 Rexoro.. Oct. 17,1946 A5pm(Ff)-52
Nov. 2, 1946 400,000 Roxoro — -. Nov. 4,1946 A5pm(Ff)~77
Each of these offers contained the following statement:
We have complied in past and intend to comply in future with WFOlO but want all protection that is afforded any other mill and expect government to reimburse us on this sale should OPA later increase ceiling and government allow any mill this difference in payoff.
105. The quantities of milled rice set forth in the following table were delivered to defendant on the dates indicated, payment being made at prices computed according to the interim price order. The table also shows the value of the rice calculated according to the final price order and the difference in each instance between the interim and final prices claimed by Tyrrell as just compensation.

*521
Contract No. Pounds Delivery date Interim price Final order price Difference claimed

12-29. 41. 52-77-500,000 381,400 240,000 300,000 400,000 10/15/46 10/20/46 10/26/48 10/28/46 11/16/46 $46,765. 96 35,664.04 22,313.30 28,093.50 37,584.00 $49,658.39 37,868.38 23,671.81 29,836.60 39,936.00 $2,892.43 2,204.34 1,358. 51 1,743.00 2,352.00
1,821,400 170,420.80 180,971.08 10,550.28
Invoices were submitted by tbis plaintiff at ceiling prices provided by Amendment 17 except as to the last contract, No. 77, as to which invoices were submitted as computed at ceiling prices provided by Amendment 20. Payment in all cases was made on the basis of ceiling prices provided by Amendment 17.
The plaintiff made further claim for payment of the difference between the interim ceiling price and the final ceiling provided by Amendment 20, but such claim was thereafter denied by the defendant.
Q. United Eice Milling Products Co., Inc.
108. On October 1, 1946, and October 16, 1946, respectively, United Eice Milling Products Co., Inc. (hereinafter referred to as “United”) offered the quantities of rice shown below to CCC “subject terms and conditions Announcement Gr-75”, “at OPA ceiling price for milled rice at time of shipment”, which offers were accepted by CCC on October 2, and October 16, 1946, respectively. The following table also shows the delivery dates, payment made by defendant on invoices submitted without protest in amounts computed according to the interim price order, the value of the rice computed according to the final price order, and the difference claimed by United as just compensation.

Contract No. Pounds Delivery date Interim price Final order price Difference claimed

A5pm(Ff)-3. 974,200 A5pm(Ff)-51. 1,064,600 10/12/46 10/25/46 $74,848.08 85,667.04 $81,741.77 92,919.38 $6,893.69 7,252.34
2,038,700 160,515.12 174,661.15 14,146.03
In submitting vouchers covering the deliveries under these contracts, United claimed without protest the prices set forth in Amendment 17. However, on December 3, 1946, United submitted vouchers to CCC claiming the difference between the amounts paid and the prices set forth in Amendment 20. This claim was eventually denied by CCC on June 13, 1947.
*522 107. The Administrator of WFO-10 wrote United the form letters discussed in findings 34 and 36. The record does not indicate what response United made to these letters.
R. Roberts Rice Milling Company
108. Under dates of October 2 and October 10, 1946, Roberts Rice Milling Company (hereinafter referred to as “Roberts”) made telegraphic offers of milled rice to CCC “subject to terms and conditions Gr-75,” at “OPA ceiling price for milled rice at time of shipment.” The first offer covered 300,000 pounds of Zenith, 100,000 pounds of Southern Pearl and 200,000 pounds of Prelude, and the second covered 500,000 pounds of Prelude. These offers were accepted on October 3 and October 10, 1946, and assigned contract Nos. A5pm(Ff)-ll and A5pm(Ff)-40, respectively.
Under date of November 2, 1946, Roberts submitted a further telegraphic offer covering 560,000 pounds of Southern Pearl, 400,000 pounds of Zenith and 640,000 pounds of Prelude. This offer stated that it was “under protest reserving right to protect ceiling price if changed retroactive for interim period.” This offer was accepted by CCC on November 4,1946, and assigned contract No. A5pm(Ff)-78.
109. The following table shows the amounts of rice delivered under the above contracts, the prices paid computed according to the interim price order, the value of the rice computed according to the final price order, and the difference claimed by Roberts as just compensation on each delivery.

Delivery Interim Vinal order Difference Contract No. Pounds date price price claimed

11.-. 600,000 10/22/46 $47,961.50 $52,335.00 $4,383.50
40... 500,000 10/23/46 40,732.50 43,770.00 3,037.50
78... 160,000 11/11/46 13,204.00 14,224.00 1,020.00
1,260,000 101,888.00 110,329.00 8,441.00
In submitting vouchers covering the deliveries under these contracts, Roberts claimed without protest the prices set forth in Amendment 17. However, subsequent to the issuance of Amendment 20, Roberts submitted invoices claiming the difference between the amounts already paid and the amounts set forth in that amendment. Payment of these was eventually refused on June 12,1947.
*523 110. During the times herein pertinent, the mill of Eoberts Eice Milling Company was located at Crowley, Louisiana, as were the mills of International Eice Milling Company and Dore Eice Mills, all being about the same size, engaged in substantially the same type of milling operations, all purchasing their rough rice in the same area, drawing labor from the same area, and paying their labor at the same rates of wages.
S. Wonder Eice Mills, Ino.

(1) Adolphus Bice Milling Company

111. Under date of September 27, 1946, Adolphus Eice Milling Company (hereinafter referred to as “Adolphus”) made a telegraphic offer to CCC of 300,000 pounds of Nira and 500,000 pounds of Bluebonnet, “subject to terms and conditions Gr-75,” “at milled rice ceilings at time shipment.” This offer was accepted the same day, and assigned contract No. AW-f(F) 54438.
Under date of October 2, 1946, Adolphus made a further telegraphic offer, on the same terms, of 1,000,000 pounds of Class Five and 4,000,000 pounds of Class Four. This offer was accepted the same day, and assigned contract No. A5pm (Ff) -8. At the request of Adolphus, this contract was thereafter amended to cover 2,800,000 pounds of Class Five and 2,200,000 pounds of Class Four, and the date of delivery was extended to November 10,1946.
112. The following table indicates the milled rice delivered under the above contracts, the amounts paid by defendant, computed according to the interim price order, the value of the rice computed under final order prices and the difference claimed by Adolphus as just compensation.
Delivery Interim Final order Difference Contract No. Pounds date price price claimed •
64438. 800,000 10/4/46 $74,128.60 $78,601.60 $4,473.00
8. 4,300,000 11/6/46 400,657.50 425,192.60 24,535.00
5,100,000 474,786.00 503,794.00 29,008.00
In submitting vouchers covering the deliveries under these contracts, Adolphus claimed without protest the prices set forth in Amendment 17.
*524 (£) Orange Bice Milling Gornfam/y
113. Under date of October 1, 1946, Orange Rice Milling Company (hereinafter referred to as “Orange”) offered to sell to CCC the quantity of milled rice which it was required to set aside under the provisions of War Food Order No. 10, as amended, at the price set forth in 2d Rev. MPR 150, at the time of delivery. This offer was accepted by CCC on October 3, 1946, and assigned contract No. A5pm(Ff)-15.
114. On November 16,1946, Orange completed delivery to defendant of 4,054,900 pounds of milled rice under the above contract number and was paid therefor the sum of $362,-176.50, computed according to the interim price order. The value of this rice computed according to the final price order was $386,630.77, leaving a balance of $24,454.27 claimed as just compensation.
115. The Administrator of WFO-10 wrote Orange the form letters relative to Orange’s set-aside deficit discussed in findings 34 and 36. The record does not indicate what response Orange made to these letters.
T. Wonder Rice Mills, Ino. (Ark.)
116. Under date of October 2,1946, Walton Rice Mill, Inc. (hereinafter called “Walton”), made a telegraphic offer to CCC to sell 600,000 pounds of Prelude and 150,000 pounds of Fortuna, “subject to terms and conditions of amendment Gr-75,” “at OPA milled rice ceiling prices in force at time of shipment.” This offer was accepted by CCC the same day, and assigned contract No. A5pm(Ff)-4.
Under date of October 14, 1946, Walton offered to CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” “450,000 pounds of Zenith at $7.64 per 100 pounds, 500,000 pounds of Early Prolific at $7.44 per 100 pounds, and 50,000 pounds of Prelude at $8.12 per 100 pounds. This offer was accepted by CCC on October 16,1946, and assigned contract No. A5pm(Ff)-49,
117. The following table indicates the amounts delivered to defendant under the above contracts, the delivery dates, the amounts paid to Wonder computed according to the interim price order, the value of the rice computed according *525 to the final order and the balance in each instance claimed by Wonder as just compensation.

Delivery Interim, Final order Difference Contract No. Pounds date price price claimed

4__ 750,000 10/18/40 $62,520.00 $67,170.00 $4,650.00
49____1,000,000 11/9/46 75,640.00 82,400.00 6,760.00
1,750,000 138,160.00 149,570.00 11,410.00
In submitting vouchers covering these deliveries, Walton claimed without protest the prices specified in Amendment 17.
No. 349-52
U. Beaumont Rice Mills
118. Under date of November 5,1946, Beaumont Rice Mills (hereinafter referred to as “Beaumont”) offered CCC, “pursuant to CCC Rice Purchase Announcement Gr-75,” 300,000 pounds of Blue Bonnet, 257,100 pounds of Nira and 1,135,300 pounds of Rexoro, at “ceiling price at time of shipment F. O. B. Mill, Beaumont, Texas.” Affixed to this offer was the following statement:
W. F. O. No. 10, provides that not later than the second business day of each month, every miller shall offer to sell and deliver the quantity of rice required to be set aside by such miller during the proceeding [preceding] month. (The O. P. A. is now considering an application that was made by us and by other rice millers for an increase in the price of milled rice. The increase is justly due.) However, to comply with W. F. O. order No. 10, the offer to which this is attached is being made under protest for the reason that the present O. P. A. ceiling prices do not provide and we reserve the right to make claim for an additional amount that will provide as provided by the 5th amendment to the Constitution.
This offer was accepted by CCC on November 7,1946, and assigned contract No. A5pm(Ff)-90.
119. Between November 12 and November 17, Beaumont delivered 1,392,400 pounds of milled rice under this “contract” for which it was paid a total of $133,125.18, computed according to the interim price order.
120. Following the granting by the Office of Price Administration of the final increase in the ceiling price of milled rice effective November 18, 1946, plaintiff submitted vouchers to the defendant claiming payment for this rice, according *526 to the prices fixed by the final ceiling price order, in the total sum of $141,067.78, but defendant paid these vouchers only in the sum of $133,125.18, suspending payment of $7,942.60, which Beaumont claims as just compensation.
Plaintiff thereafter by letters dated December 30,1946, resubmitted to defendant vouchers claiming payment for sums totaling $7,942.60, which letters stated in part:
As stated in our contract No. A5pm(Ff)-90, we were offering this rice under duress in compliance with W. F. O. #10 amendment 18, effective Sept. 19, 1946, which provides that not later than the second business day of each month every Miller shall offer to sell and deliver the quantity of rice required to be set aside by such miller during the proceeding [preceding] month. At the time this offer was made the O. P. A. was. considering an application made by us and by other Millers for an increase in the price of milled rice, and in .making this offer we reserved the right to anticipate the increase in milled rice prices as the prices in effect at the time of shipment did not justify our selling.
The O. P. A. did grant this increase in price which we had anticipated and made part of our offer and same became effective 11/18/46 and believing that we were protected by rights reserved by us in making this offer we delivered this rice before increase was granted and we feel that since this offer was under duress and was accepted by the government with reservations which we made that the amount of money which was deducted $2,344.10 should be paid and we hope that with these facts before you our claim, which we feel is just, will be paid without further delay.
The defendant denied these claims for payment.
121. The Administrator of WFO-10 wrote Beaumont the form letters concerning Beaumont’s set-aside deficit discussed in findings 34 and 36. On December 6, 1946, Beaumont wrote to the Administrator explaining that the deficit had been caused by the excessive moisture content of the rice coming into Beaumont’s mills during the 1945-46 rice season; that despite the generally bad condition of the rice, Beaumont had delivered 53 percent of its total set-aside requirements to the Government,; that on July 5, 1946, Beaumont had offered for immediate shipment rice below grade U. S. No. 5 to apply against the 1945-46 set-aside, such rice *527 being all Beaumont had; that the price asked was above the June 30,1946, ceiling price and CCC refused to pay it; that a similar offer to the Food Control Division of the War Shipping Administration was also refused with a statement that they did not need the rice, and that accordingly Beaumont offered and sold the rice in the domestic market. Beaumont took the position in the letter that under the circumstances it had substantially fulfilled its obligations to the Government and reminded the Administrator of a letter of December 14, 1945, from the Production Marketing Administration which stated that if Beaumont had not, by the close of a season, milled enough grade U. S. 5 or better rice to meet its total set-aside obligations, the Administration would consider a petition for an outright release from the set-aside on an “appropriate quantity”. Beaumont then asked to be so released for the 1945-46 deficit of 77,767 pockets.
122. Thereafter a civil action for an injunction was instituted by defendant to restrain Beaumont from delivering any milled rice into trade or commercial channels until alleged deficits in rice required to be set aside by WFO-10 were made up.
123. Between November 5 and November 17, 1946, Beaumont did not make any sales of rice to its civilian customers except brewers’ rice, for which no request for an increase in ceiling price had been filed.
V. Edmundson-Duhe Bice Miel Company, Inc.
124. Under date of October 14, 1946, Edmundson-Duhe Bice Mill Company, Inc. (hereinafter referred to as “Ed-mundson”), telegraphed to CCC as follows:
UNDER PROTEST AS OUTLINED IN LETTER TO SECRETARY OP AGRICULTURE WE OPPER SUBJECT TO GRO-75 TENDER NUMBER 5 400,000 POUNDS UNPOLISHED BLUE ROSE CLASS VI GRADE 6 TO BETTER POUR TO PIPTY PERCENT BROKENS ALSO OPPER 200,000 POUNDS REXORO UNPOLISHED RICE CLASS IV GRADE 6 TO BETTER POUR TO PIPTY PERCENT BROKENS BOTH AT INTERIM CEILING PRICE POB RAYNE LOUISIANA RAILROADS T&P AND T&NO RICE TO BE PACKED IN 2.85 OSNA-BURGS PLEASE ISSUE SHIPPING INSTRUCTIONS PROMPTLY AS OUR WAREHOUSE STORAGE JAMMED
*528 This offer was accepted by CCC on October 15, 1946, and assigned contract No. A5pm(Ff)-48.
The letter to the Secretary of Agriculture, referred to in the preceding telegram, is not in evidence in these cases.
125. On November 17, 1946, Edmundson completed delivery of 600,000 pounds of milled rice to defendant and was paid $48,674.50. Vouchers covering these deliveries were dated November 18,1946, but claimed prices provided by the interim price order. The value of this rice computed according to the final price order was $52,380.50, leaving a balance of $3,706 claimed as just compensation.
W. Louisiana State Rice Milling Company, Inc.
126. Louisiana State Rice Milling Company, Inc. (hereinafter referred to as “Louisiana”), made telegraphic offers to CCC as follows:
On September 24, 1946, it offered 5,200,000 pounds of Early Prolific at “O. P. A. ceiling price for milled rice at time of shipment,” shipment to be made in specified quantities from its six mills. This offer was accepted September 25, 1946, and assigned contract No. AW-F(F) 54434. On October 2 and 3, 1946, plaintiff requested that the contract be increased to cover additional quantities of 232,000 pounds and 219,700 pounds, respectively, which requests were concurred in by CCC.
On October 8, 1946, it offered 2,405,200 pounds of Early Prolific, 1,500,000 pounds of Zenith, 1,500,000 pounds of Nira, and 143,400 pounds of Pearl, to be shipped from designated mills, at “OPA ceiling price for milled rice at time of shipment.” This offer was accepted by CCC on October 9,1946, and assigned contract No. A5pm(Ff)-31. At plaintiff’s request the quantity of Early Prolific was thereafter increased by 112,900 pounds.
On October 25,1946, it offered “at ceiling price at time of shipment under MPR-150 as amended,” 356,400 pounds of Early Prolific, 4,455,500 pounds of Nira, 2,700,000 pounds of Rexoro, 1,400,000 pounds of Blue Rose, 246,700 pounds of Zenith, and 2,000,000 pounds of Pearl, to be shipped from specified mills. This telegram stated:
*529 This offer is made under protest and without prejudice to our right to recover additional allowances made in final adjustment of milled rice prices under MPE 150 as amended.
This offer was accepted by CCC on October 28, 1946, and assigned contract No. A5pm(Ff)-63. At plaintiff’s request this was subsequently increased by 900,800 pounds of Blue Eose, 2,778,700 pounds of Eexoro, and 500,000 pounds of Nira.
127. The following table indicates the amounts of milled rice delivered to defendant under the above contracts, the delivery dates, the amounts paid to Louisiana computed according to the interim price order, the value of the rice computed according to the final price order, and the balance in each instance claimed by Louisiana as just compensation.

Delivery Interim Final order Difference Contract No. Pounds date price price claimed

54434... 5,651,700 10/19/46 $426,789.81 $468,197.94 $41,408.13
31-... 5,661,400 10/23/46 456,425.72 495,309.33 38,883.61
63-. 2,366,700 11/6/46 205,017.01 219,754.19 14,737.18
13,679,800 1,088,232.54 1,183,261.45 95,028.92
In submitted vouchers for payment under contracts 54434 and 31, Louisiana claimed the prices set forth in Amendment 17. Its vouchers under contract 63 were dated November 19, 1946, and claimed the prices set forth in Amendment 20, but CCC disallowed so much of them as was in excess of the prices specified in Amendment 17. Louisiana submitted further vouchers in January 1947, claiming under each contract the difference between the amounts paid and the prices set forth in Amendment 20, but these amounts were not paid.
128. The books and cost records of Louisiana (audited by defendant under Eule 28 (3)) show that at the amounts computed according to the interim price order which Louisiana was paid for the above quantities of milled rice, Louisiana suffered a net loss of $84,514.42.[1]
*530 129. The Administrator of WFO-10 wrote Louisiana the form letters concerning deficits in set-asides for the 1945-46 milling season discussed in findings 34 and 36. On October 10, 1946, the United States instituted a criminal action against Louisiana charging it with failure to fully observe the requirements of the set-aside order for the months of August through December 1945, and a fine was subsequently imposed on Louisiana based on the number of pockets of the alleged deficit.
130. Louisiana’s mill, known as Peoples Rice Mill, was located at Crowley, Louisiana, where were also located the Dore Rice Mill and the International Rice Milling Company mills. These mills were approximately the same size, were engaged in substantially the same type of milling operations, purchased their rough rice in the same area, and their labor was drawn from the same area, at the same rates of wages.
X. Republic Rice Mill, Inc.
131. Under date of September 27,1946, Republic Rice Mill, Inc. (hereinafter referred to as “Republic”), made a telegraphic offer, “subject to terms and conditions announcement Gr-75” of 160,000 pounds of Fortuna, 200,000 pounds of Zenith and 160,000 pounds of Early Prolific “at milled rice ceilings at time of shipment.” This offer was accepted by CCC the same day, and assigned contract No. Aw-f (F) 54439.
On September 30,1946, Republic offered to sell to CCC the quantity of milled rice it was required to set aside under War Food Order No. 10, as amended, at the price set forth in 2d Rev. MPR 150 at the time of delivery. This offer was accepted by CCC on October 2, 1946, and assigned contract No. A5pm(Ff)-5.
132. The following table indicates the amounts delivered to defendant under the above contracts, the delivery dates, the amounts paid to Republic computed according to the interim price order, the value of the rice computed according to the final order and the balance in each instance claimed by Republic as just compensation.

Delivery Interim Final order Difference Contract No. Pounds date price price claimed

54439. 520,000 10/24/46 $41,273.00 $44,714.00 $3,441.00
5. 2,500,000 11/16/46 217,490.00 233,002.50 15,511.60
3.020.000 258.763.90 277.716.50 18.952.60
*531 In submitting vouchers covering these deliveries, Republic claimed without protest the prices set forth in Amendment II on all but the last five submitted under contract 5; these vouchers, each dated November 16, 1946, claimed the prices set forth in Amendment 20, but CCC paid only the prices set forth in Amendment 17.
No. 466-52
Y. American Rice Growers Cooperative Association
133. Under dates of October 7 and October 30,1946, American Rice Growers Cooperative Association (hereinafter referred to as “American”) made two offers to CCC, the first of 3,000,000 pounds and the second of 5,000,000 pounds of Rexoro. Each offer was made “pursuant to CCC Rice Purchase Announcement Gr-75,” at “$9.90 net cash FOB cars Houston subject to adjustment for actual broken content— as per certificate.” These offers were accepted October 8 and October 31,1946, and assigned contract Nos. A5pm(Ff )- 30 and A5pm(Ff)-7l, respectively.
134. The following table indicates the amounts delivered to defendant under the above contracts, the delivery dates, the amounts paid to American computed according to the interim price order, the value of the rice computed according to the final order and the balance in each instance claimed by American as just compensation.

Delivery Interim Final order Difference Contract No. Pounds date price price claimed

30... 3,000,000 11/2/46 $286,465.25 $303,413.75 $17,958.60
71. 2,300,000 11/17/46 215,805.60 229,262.40 13,456.80
6,300,000 501,260.85 532,676.15 31,415.30
In submitting vouchers covering these deliveries, American claimed without protest the prices set out in Amendment 17.
135.American had knowledge of the criminal actions instituted by the Government against mills which had failed to observe the set-aside requirements of the Government and believed that noncompliance would result in its being prosecuted similarly. American considered the set-aside requirements to be mandatory and believed that a protest would have been pointless.
*532 136. American’s costs on deliveries of rice to the Government under set-aside orders were somewhat greater than on sales of rice into trade channels because of the necessity of special markings on the bags which had to be done by hand, the loss of the usual milling in transit maim which American could take advantage of on civilian sales, and the increased interest American had to pay on its operating loans as a result of the longer period of time which elapsed between delivery and payment on government sales than on civilian sales.
A markup of 4 percent was permitted rice millers by OPA in the sale price of milled rice for export. At the time of the deliveries to defendant which are the subject of this suit, American had an approved quota of milled rice for export which it was unable to fulfill because of the necessity of complying with the set-aside orders.
137. During the period in suit, American was making limited, rationed deliveries of its rice to civilian trade at the interim ceiling price in order to maintain the good will of its customers and to retain them as customers in the postwar period.
No. 473-52
Z. Woodland Rice Company
138. Under date of September 26, 1946, Woodland Rice Company (hereinafter referred to as “Woodland”) submitted an offer to CCC to sell it the quantity of milled rice it was required to set aside under the provisions of War Food Order No. 10, at the prices set forth in 2d Rev. MPR 150, as amended, at the time of delivery. This offer was accepted by CCC on September 27, 1946, and assigned contract No. Awf (F)-52348.
Between October 8 and November 8, 1946, Woodland delivered to the defendant 2,000,000 pounds of milled rice for which it was paid on invoices submitted to the defendant without protest, computed in accordance with Amendment 17, the sum of $155,450.
139. Had the price of the above order been computed in accordance with the final price order, the value of the rice would have been $169,900 and Woodland claims as just compensation the $14,450 representing the difference.
*533 140. While the price increases requested and finally granted in November 1946, were under consideration by OPA, Woodland sold rice to its civilian customers only to the extent deemed necessary to retain their good will. Woodland believed that compliance with the set-aside orders was mandatory and that non-compliance would have resulted in the bringing of civil and criminal actions against Woodland by the Government.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgments herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States the amounts indicated below, with interest at the rate of 4 percent per annum from the delivery dates indicated below until paid, all interest being allowed not as interest but as a part of just compensation.
In case No. §48-52: (1) The Arkansas Rice Growers Cooperative Association,

Amount Delivery date

$2,550.00_10/18/46
2,716.36_10/29/46
3.348.20_11/6/46
3,740.00_11/9/46
1,530.00_11/9/46
1,496.00_11/13/46
2,499.74_11/15/46
5,389.00_10/25/46
4,576.00_10/24/46
1,624.00_11/7/46
4.230.21_11/14/46
(2) John M. Chumney and Robert L. Williams, a partnership, trading as Gulf Coast Rice Mills,

Amount Delivery date

$4,340.00_10/22/46
1,816.50_10/28/46
(3) El Campo Rice Milling Company, Inc.,

Amount Delivery date

$6,398.00_11/2/46
*534 (4) Kaplan Rice Mill, Inc.,

Amount Delivery date

$14,640.50_11/17/46
2,250.00_11/17/46
(5) Lake Rice Mill, Inc., and Maple Curtis Hughes and Julius Agustus Boutte to the use of Lake Rice Mill, Inc.,

Amount Delivery date

$5,306.00_11/2/46
(6)William M. Loving.

Amount Delivery date

$8,946.40_u_ _ 11/2/46
5,900.06_ _ 11/16/46
(7)Mermentau Rice Mill Company, Inc.

Amount Delivery date

$2,207.50_10/12/46
2,320.50_10/23/46
(8)Mouton Rice Milling Company,

Amount Delivery date

$680.00_10/24/46
578.00_10/25/46
1,224.00_11/1/46
1,156.00_11/9/46
(9)National Rice Mills, Inc.,

Amount Delivery date

$1,216.03_11/8/46
1,626.40_11/6/46
2,296.63_11/13/46
(10)Pritchard Rice Milling Company, Inc.,

Amount Delivery date

$1,204.00_10/18/46
2,450.00_10/23/46
(11)Producers Rice Mill, Inc.

Amount Delivery date

$2,931.00_10/22/46
924.00_11/16/46
*535 (12)River Brand Rice Mills, Inc.,

Amount Delivery date

$10,475.75_ _ 11/1/46
3,919.00_ _ 11/16/46
7,643.00_ _ 10/31/46
3,466.00_ _ 10/29/46
605.20_ _ 11/5/46
6,024.50_ _ 11/7/46
2,070.00_ _ 11/16/46
4.980.50_ _ 11/16/46
3.968.50_ _ 11/16/46
935.00_ _ 11/9/46
5.388.50_ _11/16/46
(13) Eugene P. Sabatier and George Sabatier, a partnership, trading as The Superior Rice Mill Company,

Amount Delivery date

$7,198.50_11/17/46
(14) George Smith, John A. Smith, C. P. Cheney, Otto Leibrock, Mrs. J. A. Smith, Trustees of Smith Rice Mill Company in dissolution,

Amount Delivery date

$5,428.12_10/16/46
11,126.74_10/24/46
13,421.70_11/14/46
(15)Wayne Thomson, liquidator of Imperial Rice Milling Company, Inc.,

Amount Delivery date

$6,375.00_10/23/46
(16) Tyrrell Rice Milling Company,

Amount Delivery date

$2,892.43_10/15/46
2.204.34_10/20/46
1,358.51_10/26/46
1,743.00_10/28/46
2,352.00_11/16/46
(17) United Rice Milling Products Co., Inc.,

Amount Delivery date

$6,893.69_10/12/46
7.252.34_10/25/46
(18)Cecil O. Wofford, Millard D. Roberts, William D. Roberts, Jr., and Louise S. Norvell, Mrs. James H. Gulledge, executrix of the estate of James H. Gulledge, deceased, and *536 Henry T. Stratton, executor of the estate of Mrs. Ruth A. Stratton, deceased, to the use of Cecil O. Wofford, Millard D. Roberts, and William D. Roberts, Jr.,

Amount Delivery date

$4,383.50_10/22/46
3,037.50_10/23/46
1,020.00_11/11/46
(19) Wonder Rice Mills, Inc., and Robert D. Holland, to the use of Wonder Rice Mills, Inc.,

Amount Delivery date

$4,473.00. _ 10/4/46
24,535.00. _ 11/6/46
24,454.27. _ 11/16/46
(20) Wonder Rice Mills, Inc. (Ark.),

Amount Delivery date

$4,650.00- 10/18/46
6,760.00- 11/9/46
In case No. 3I¡.9-52: (1) Beaumont Rice Mills,

Amount Delivery date

$7,942.60- 11/17/46
(2)Edmundson-Duhe Rice Mill Company, Inc.,

Amount Delivery date

$3,706.00- 11/17/46
(3)Louisiana State Rice Milling Company, Inc.,

Amount Delivery date

$41,408.13_ _ 10/19/46
38,883.61_ - 10/23/46
14,737.18_ - 11/6/46
(4)Republic Rice Mill, Inc.,

Amount Delivery date

$3,441.00- 10/24/46
15,511.60-11/16/46
In case No. 166-52: American Rice Growers Cooperative Association,

Amount Delivery date

$17,958.50. _ 11/2/46
13,456.80. 11/17/46
*537 In case No. lfi/3-52: William Crawford, an individual formerly doing business under the firm name and style of Woodland Nice Company,

Amount Delivery date

$14,450.00_11/8/46

 Dore Rice Mill (No. 48682) and International Rice Milling Co., Inc. (No. 48683), 119 C. Cls. 560.

 The price relief sought was under the new standards set forth In the Price Control Extension Act of 1946, and although at the time the interim order was Issued no formal application for price increases had been filed by the Industry Advisory Committee for the rice milling industry, there had been presented to OPA in August an Informal application for such price Increases. The circumstances concerning the submission of the informal application and later the formal application for price relief under the new law wiU be discussed In some detaU hereinafter.

 The Supreme Court noted specifically that the whole pepper involved in the Commodities case was a nonperishable commodity which had been purchased long prior to the taking and which was stored during the interim.

 The balance of this subparagraph relative to the action of the Administrator on such applications is quoted in our finding 10.

 A Rice Milling Industry Advisory Committee had been appointed by the Office of Price Administration in 1943 pursuant to the provisions of the Emergency Price Control Act of 1942, to advise, consult with and make recommendations to OPA with respect to rice milling industry matters.

 As noted in finding 3, riee was grown in California under conditions different from those in the south, and the milling seasons, operating costs and competitive markets were different. All of these differences were recognized by OPA in its orders and in the fixing of celling prices.

 As noted earlier herein, the period which elapsed before the Industry Advisory Committee submitted to OPA the comprehensive data to support its application for price increases under the July 25, 1946, law, was entirely the fault of OPA. Although the law was enacted on July 25, 1946, OPA did not issue the required procedural regulation until September 17, 1946, and when it was issued its requirements were so complex and involved that the industry was unable to furnish all the data required until October 16, 1946. Following submission of that data, OPA decided to consider the application of the California millers along with the application of the southern States millers, although it had assured the latter that it would not do so, and this action further delayed the final determination on the application until November 18, 1946.

 Dore Rice Mill and International Rice Milling Company, Inc., not involved in these suits, were plaintiffs in two suits against the united States, Nos. 48682 and 48683, respectively, decided by the court and reported in 119 C. Cls. at p. 560 (1951). In general, the facts and issues in the earlier cases and in the present ones are identical.

 The Commodity Credit Corporation was not an operating agency but simply supplied tbe funds for the operation of the programs of the Department of Agriculture. The rice program was actually administered by the War Rood Administration, and the reports and tenders of deliveries of rice, etc., addressed to the Commodity Credit Corporation by the rice miUers, were in faet made direct to the War Food Administration.

 Issued on September 24, 1946.

 No contention is made by plaintiffs herein that the ceiling prices for milled rice fixed by the final price order of November 17, 1946, were not fair and equitable generally at the time the order was issued. It is contended, however, that such final order prices were also generally fair and equitable compensation for the rice delivered by these plaintiffs between September 16, 1946, and November 17, 1946, whereas the prices contained in the interim order (Amendment 17 to MPR 150, effective September 16, 1946) were not fair and equitable within the meaning of section 6 of the Price Control Extension Act of 1946, nor just compensation to the millers.

 Subsequent to the receipt in evidence of plaintiff's Exhibit 111, which is the basis for this finding, defendant informally raised a question about the application of a credit for the sale of certain milling by-products. Inasmuch as the prices of milling by-products were not considered by OPA in making the increases in prices reflected in the final price order, no material issue appears to have been raised. If a credit were allowed for income from the sale of Louisiana’s by-products, Louisiana still sustained a net loss in excess of $33,000.